CHRISTUS HEALTH SOUTHEAST TEXAS d/b/a Christus Hospital—St. Mary, Appellant,

v.

Mary Ann LICATINO, Individually and as representative of the Estate of Stacy Meaux, and Robert Meaux, as next friend of Matthew Meaux, and Leo D. Fairchild, Jr., as next friend of Celina Fairchild, Appellees.

No. 09–10–00199–CV.

Court of Appeals of Texas, Beaumont.

Submitted on June 9, 2011.

Decided Oct. 13, 2011.

Erin E. Lunceford, Sprott, Rigby, Newsom, Robbins & Lunceford, P.C., Houston, for appellant.

Thomas C. Wright, Michael Choyke, Nicholas J. Chapleau, Wright & Close, LLP, Houston, Clay Dugas, Mike Jacobellis, Clay Dugas & Associates, Beaumont, for appellees.

Before McKEITHEN, C.J., KREGER and HORTON, JJ.

## OPINION

CHARLES KREGER, Justice.

A heart attack killed Stacy Meaux hours after her discharge from the emergency room at Christus Health Southeast Texas d/b/a Christus Hospital—St. Mary. We hold that the evidence of deviation from the standard of care by St. Mary's nursing staff is legally insufficient to support the jury's finding that the willful and wanton negligence of the hospital was a proximate cause of Stacy's death. Accordingly, we reverse the trial court's judgment and render a take-nothing judgment.

■ In an appellate review of the legal sufficiency of the evidence supporting a jury's finding, the test is whether the evidence "would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex.2005). As the reviewing court, we "must credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not." *Id.* In addition, we must "consider [the] evidence in the light most favorable to the verdict, and indulge every reasonable inference that would support it. But if the evidence allows of only one inference, neither jurors nor the reviewing court may disregard it." *Id.* at 822 (footnotes omitted).

Section 74.153 of the Texas Civil Practice and Remedies Code provides:

> In a suit involving a health care liability claim against a . . . health care provider for . . . [the] death of a patient arising out of the provision of emergency medical care in a hospital emergency department, . . . the claimant . . . may prove that the treatment or lack of treatment by the . . . health care provider departed from accepted standards of medical care or health care only if the claimant shows by a preponderance of the evidence that the . . . health care provider, with willful and wanton negligence, deviated from the degree of care and skill that is reasonably expected of an ordinarily prudent . . . health care provider in the same or similar circumstances.

Tex. Civ. Prac. & Rem.Code Ann. § 74.153 (West 2011).

■ The charge instructed the jury that "Willful or wanton negligence" means more than momentary thoughtlessness, inadvertence, or error of judgment. It means such an entire want of care as to establish that the act or omission complained of was the result of conscious indifference to the rights, safety, or welfare of the persons affected by it.

Licatino argues that the nurses' failure to follow the hospital's chest pain protocol shows such an entire want of care as to establish that their negligence was the result of conscious indifference. St. Mary's chest pain procedures direct the triage

nurse to obtain a patient assessment according to the triage standard of care. During triage, the nurse obtains a patient history, including an acute history of precipitating factors, duration of pain, quality of pain, intensity of pain, and associated symptoms. The nurse determines what medications the patient is taking. The nurse assesses risk factors, including family history, previous history of cardiac disease, smoking history, hypertension, obesity, diabetes, and hypercholesterolemia. If the chest pain protocols are enacted, the patient is assigned a triage category of one or two. The nurse notifies the charge nurse for a bed assignment; if a bed is not immediately available for a patient in category two, an EKG is obtained and evaluated immediately by the doctor and the charge nurse.

According to St. Mary's chest pain protocols, the nurse providing care in the treatment area ensures adequate oxygenation for a patient with suspected cardiac chest pain. The protocols call for a cardiac monitoring document with rhythm strip, an EKG, saline lock for IV access and appropriate lab work, including cardiac enzymes, and an X-ray. For treatment of chest pain of suspected non-cardiac origin, the protocols call for obtaining a patient history, including fever, cough, trauma, medications and response, intensity, change with respiration or movement, and recent surgery. If the patient is in triage category one or two, the nurse starts a saline lock, draws labs appropriate to the clinical presentation, and obtains a chest X-ray if appropriate.

In Stacy's case, the admissions clerk at St. Mary's emergency room created a "face sheet" at 6:28 p.m. on October 2, 2007. The admissions clerk listed Stacy's reason for visit as "Chest Pain." An emergency admission record was filled out at 6:40 p.m. A triage time of 6:16 p.m. was noted on the form, and an entry showed that at 6:18 p.m. Stacy reported a pain level of "8." Stacy's temperature was "97.9," her heart rate was "97," her respiration rate was "20," and her blood pressure was "186/96." The patient history notations "SM, HTN, CVA" referred to the presence of risk factors of smoking, hypertension, and cerebral vascular accident. Nurse White, the triage nurse, recorded Stacy's chief complaint as " 'pain from above waist to head, neck and arms.' " White noted that Stacy had normal oxygen saturation and that she did not exhibit shortness of breath. White did not ask Stacy if she had chest pain radiating to her arm or jaw. When asked if a good nurse is supposed to ask probing questions, she replied, "But you're not supposed to ask suggestive questions." White noted that Stacy took Glucophage, and that she also took Avandia, Norvasc, and Accupril but that she was "out of meds" for the last three medications. White assessed Stacy as presenting generalized pain and triaged Stacy as a level three, for patients that require urgent treatment but have not presented with a life-threatening, immediate problem. A level two patient is seriously ill or has potentially life-threatening injuries that may deteriorate without immediate intervention. The time frame for taking a level two patient back for treatment is thirty minutes. A level one patient would be taken back and an EKG would be performed immediately. There were no level one or level two patients in the emergency room when Stacy presented to the emergency room. According to White, Stacy did not display the obvious distress usually presented by patients experiencing impending heart attacks.

After Stacy had been triaged as a level three patient, Nurse Howlett treated Stacy from 6:45 p.m. until 7:10 p.m. Howlett testified that chest pain is a nursing diagnosis. His job as a nurse is to address the

nursing diagnosis, chart it, and implement the plan. Although the friend who accompanied Stacy to the emergency room was certain that Stacy complained to the nurses about pain in her chest and arms, Howlett claimed that Stacy did not specifically mention chest pain. He admitted that it was his job to find out where Stacy's pain was located, but that in this instance, he did not document it. He admitted that the standard of care for a patient complaining of chest pain is to get complete information and to follow up on the information, and he admitted that he failed to meet this standard in Stacy's case. He checked her respiration and found clear breath sounds, checked her capillary refill and found it to be normal, checked her pulse, and checked her range of motion. He documented Stacy's blood pressure, pulse, respiration, temperature, and oxygen saturation from triage. He performed his own assessment, and evaluated Stacy at 6:45, ten minutes before she saw the doctor.

An emergency services flowsheet signed by Howlett and Trotter dated October 2, 2007, at 6:45 p.m. listed Stacy's complaint as "pain from breast to head." The doctor evaluated Stacy at 6:55 and ordered a breathing treatment. He noted that the patient was not in acute distress. His clinical impression was "hypertension" and "bronchospasm." At 7:10, Howlett gave Stacy the blood pressure medication that the doctor ordered. Nurse Trotter performed an Accu-check on Stacy and recorded a glucose level of 225. A chest X-ray was ordered at 7:11 and an EKG was performed at 7:20. The first EKG showed "septal infarct, age undetermined."[1] Stacy received a breathing treatment at 7:15. At 7:20, Stacy's pulse rate was "87," her respiration rate was "16," and her oxygen saturation level was "97%." A second EKG was performed at 8:25 and was interpreted as normal. At that time, Stacy's blood pressure was "130/82," her heart rate was "71," her respiration rate was "16," and she reported a pain level of "3." The chart notes that the patient stated that the pain was much better.

The doctor filled out an emergency physician record on a "Chest Pain" form. The doctor recorded the patient's chief complaint as "chest pain/discomfort." Under history he wrote "1 day or so." The doctor noted that Stacy was experiencing tightness across the chest and upper arms that was worsened by deep breaths. The doctor noted prolonged splinting or decreased air movement and wheezing. He noted a past history of high blood pressure and diabetes, and noted that Stacy was a smoker and had a family history of cardiac disease after the age of "55." The doctor reviewed the nursing assessment. He also reviewed the EKGs and X-ray. The X-ray report noted a history of "Chest pain for 2 days." The X-ray report noted that no previous exams were available for comparison, that the cardiomediastinal silhouette and pulmonary musculature were normal, and that the lungs were clear and bone structures were normal. The doctor noted that the chest X-ray was normal. He also noted that the second EKG was normal and showed a heart rate of "79" and the pulse oximeter showed "100%." The doctor made a clinical impression of hypertension, found the patient was stable, and discharged her home.

The doctor at trial admitted that he had erred in deciding that Stacy was stable. According to the doctor, Stacy had unstable angina and she was not stable at discharge. He explained that

I have a lady that had many risk factors. I thought I had answered that her—her complaint with her blood pressure and

1. The pathologist who performed the autopsy did not find a septal infarct.

her bronchospasm and the two EKGs that didn't have evolving changes and I thought that she was stable. I was wrong. It turns out that she had unstable angina. I failed her.[2]

According to the doctor, there was a delay in obtaining the EKG, which easily could have been done sooner, but that there was no reason to believe that an earlier EKG would have differed from the two tests that they had available to them in forming a diagnosis. The nurses did not draw cardiac enzymes, but these tests were not ordered by the doctor. The chart reflects the presence of multiple risk factors for coronary artery disease. However, Stacy exhibited no associated symptoms—nausea and vomiting, coughing blood, syncope, feeling of doom, shortness of breath, sweating and palpitations—and a physical examination of her cardiovascular system—regular rate/rhythm, no murmur, no gallop, no friction rub, pulses full/equal—presented in normal range. She was not cyanotic, diaphoretic, or pallid. There were two "EKGs with a whole day of pain, not having acute changes[.]" Because his impression was that Stacy's chest pain was of non-cardiac origin, the doctor did not order cardiac enzyme tests. According to the doctor, the level three triage assigned to Stacy provided more than enough time for him to make the correct decision. He testified that he made the wrong decision.

Nurse Odom acted as the discharge nurse. She told Stacy to return to the emergency room if the pain returned or worsened. The doctor instructed Stacy to set up an appointment the following day with her doctor to address her high blood pressure. Odom took Stacy's vital signs and assessed her pain. At 8:25 Stacy's blood pressure was "130/82," her pulse was "71," and her respirations were "16." Sta-cy would not have been discharged if those vital signs had been abnormal. Odom acknowledged that a patient may have stable vital signs and still have unstable angina. The hospital's emergency admission record states that the doctor diagnosed Stacy with high blood pressure and prescribed lisinopril. Stacy was discharged at 8:45 p.m. The discharge instructions informed Stacy to call sooner if she thought it was necessary, and to return immediately if her symptoms worsened.

The emergency room physician testified that the nurses did not follow the procedure for a chest pain patient with multiple predisposing factors. He further testified that if the nurses had triaged Stacy at level one, she would have been hooked up to a cardiac monitor. Stacy was in the emergency room for two hours and thirty-seven minutes, but a cardiac monitor rhythm strip was not done and she was not given nitroglycerin or aspirin. If the nurses had followed the protocols for chest pain of suspected cardiac origin, she would have been on a heart monitor and nitroglycerin or aspirin could have been administered.

Stacy collapsed at her home approximately seven and one-quarter hours after she was discharged from St. Mary's emergency room. The pathologist who performed the autopsy testified that Stacy had severe atherosclerosis of the circumflex coronary artery and the right coronary artery. The left anterior descending artery had moderate atherosclerosis. A discolored region along the lateral side of the left ventricle indicated a heart attack.

Although he saw no evidence that the nurses failed to implement any of the doctor's orders, and the discharge instructions informed Stacy to return to the

---

2. According to one of the experts who testified at trial, unstable angina is a historical presentation of chest pain that is changing from its previous pattern.

emergency room if her pain worsened, the plaintiff's expert on emergency medicine testified that St. Mary's nurses contributed to Stacy's death. He explained that the proper treatment for unstable angina is to first make the diagnosis. Based on the diagnostic findings, the treatment is to assess myocardial function, perform a cardiac perfusion study, or take the patient directly to cardiac catheterization or CT angiography. Based on these findings, a decision would be made as to angioplasty and stenting or a bypass. The expert did not believe that either the doctor or the nurses intentionally harmed Stacy, but Stacy presented with symptoms that were very consistent with unstable angina and myocardial infarction. In his opinion, with her significant risk factors of hypertension, smoking, and diabetes, the possibilities of myocardial infarction and unstable angina were not adequately evaluated.

The plaintiffs' nursing expert testified that the first step in the nursing process is a complete assessment. For chest pain, assessment questions include how long the patient has had the pain, where the pain is located, and whether the pain radiates. The next step is the nursing diagnosis, which requires independent nursing judgment. The nurse forms a nursing ambulance for that patient and implements that ambulance, meaning that if the nurse felt the condition was cardiac-related, the standard of care would be to take the patient back to a room, get an EKG, and follow the hospital's emergency department protocols. If a procedure falls within the standing protocols, the nurse may initiate without a physician's order. The nurse also reevaluates the patient to see if the interventions helped.

The plaintiff's nursing expert faulted the assessment performed by the triage nurse in Stacy's case. The triage nurse listed a vague location for the pain and did not mention alleviating factors. In the expert's professional opinion, the assessment that the nurse performed was below the standard of care. The nurse should have pinpointed the pain and she did not triage the patient as a level one or two, with the result that the patient sat in the waiting room instead of being immediately brought back to be seen by the doctor. The expert stated that he would have triaged Stacy as a level one and would have brought her back immediately, but this expert could not state that a level two triage that would require the patient to be brought back within an hour would have been below the standard of care. In the nursing expert's opinion, Stacy's nurses were not aware that Stacy had unstable angina. The nurses did not perform an assessment that was sufficient to make them aware that Stacy was experiencing unstable angina. In the expert's opinion, St. Mary's nurses failed to meet the standard of care because they failed to order cardiac enzymes for a patient with cardiac risk factors. Cardiac enzymes can be elevated when there is chest pain. The nurses did not implement the chain of command to question the doctor's handling of the patient. This expert testified that St. Mary's nurses should have questioned the doctor or the charge nurse when the doctor decided to discharge Stacy.

The record shows that none of the nurses knew or suspected that Stacy was experiencing unstable angina. At the time of discharge, Stacy had a normal EKG and a normal X-ray, her blood pressure, respiration and oxygenation were in normal range, and her pain had improved. The chain of command is implemented when the nurse disagrees with the doctor's decisions regarding patient care. There is no evidence that any of St. Mary's nurses disagreed with the doctor's diagnosis or course of treatment in this case. Any deviation from the standard of care arises

from their failure to recognize that Stacy was experiencing unstable angina in the first place and to make a nursing diagnosis of cardiac chest pain.

Viewed in the light most favorable to the verdict, the evidence demonstrates that St. Mary's nurses deviated from the hospital's procedures for the assessment and treatment of chest pain. The friend who accompanied Stacy to the emergency room testified that Stacy related to the hospital personnel that she was experiencing pain in her chest and arms. White triaged Stacy's condition as urgent but not life-threatening, although Stacy was experiencing chest pain and high blood pressure and the hospital's chest pain protocols stated that a patient with abnormal vital signs and risk factors should be assigned triage category one. The nurses failed to pinpoint the location of Stacy's pain, and thus failed to determine that the pain was in her chest and that it was radiating to her arm. Consequently, the nurses failed to follow the treatment procedure for a patient with suspected cardiac chest pain. Had they followed the procedure for suspected cardiac chest pain, the nurses would have used a heart monitor with a rhythm strip, and they would have drawn blood to test for cardiac enzymes.

■ Because the nurses provided emergency medical care in a hospital emergency department, Licatino must prove that the nurses deviated from the standard of care with willful and wanton negligence. Tex. Civ. Prac. & Rem.Code Ann. § 74.153. The plaintiff must prove an extreme degree of negligence. *See Turner v. Franklin*, 325 S.W.3d 771, 781 (Tex. App.-Dallas 2010, pet. denied) (equating statutory burden of proof with that for gross negligence); *Benish v. Grottie*, 281 S.W.3d 184, 191 (Tex.App.-Fort Worth 2009, pet. denied) (describing the state of mind of the actor that is required for

establishing liability under section 74.153). Stacy was triaged immediately upon her arrival. The nurses did assign urgent status to Stacy, and no other patients present at that time were assigned a higher level of urgency. She was taken to the treatment room and seen by the treating physician in approximately one-half hour.

In an attempt to ascertain a diagnosis, Stacy received two EKGs and a chest X-ray. The doctor did evaluate Stacy for chest pain and he recorded his medical assessment of her cardiovascular system. He was aware of Stacy's risk factors for cardiac disease, and he knew that Stacy was experiencing a sensation of tightness across her chest and arms. The nurses checked Stacy's vital signs after she received the treatment that the doctor ordered, and her apparent condition had improved. The doctor and the nurses thought that Stacy's medical complaint had been adequately addressed. They were wrong, and their mistakes proved to be fatal for Stacy, but the nurses neither disregarded what they knew to be pain of a cardiac origin nor allowed a patient to be discharged whom they knew to be in an unstable emergent condition. When we credit all of the favorable evidence that the jury could have credited, and disregard all of the evidence that the jury could reasonably disregard, the evidence shows that by failing to follow the hospital's chest pain protocols, the nurses failed to exercise ordinary care that health care providers of ordinary prudence would exercise. *See City of Keller*, 168 S.W.3d at 827. But an entire want of care cannot reasonably be inferred under circumstances in which the nurses recorded the patient's history and determined the status of her medications, took the patient's vital signs, promptly got the patient to the emergency room physician, provided EKGs and an X-ray to assist the doctor in making his diagnosis,

provided the treatment for hypertension and bronchospasm as ordered by the doctor, and ascertained that the patient's blood pressure and oxygenation were within normal limits at the time of discharge. *See id.* at 829. None of the evidence supports an inference that the nurses consciously disregarded their patient's welfare. *See id.* Licatino failed to establish the degree of deviation from the standard of care that is required to impose malpractice liability on a provider of emergency health care services. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.153.

We sustain issue one. We need not address St. Mary's remaining issues, as they would not result in greater relief.[3] *See* Tex.R.App. P. 47.1. Accordingly, we reverse the trial court's judgment on the jury's verdict and render judgment that Mary Ann Licatino, individually and as representative of the Estate of Stacy Meaux, and Robert Meaux as next friend of Matthew Meaux, and Leo D. Fairchild, Jr., as next friend of Celina Fairchild, take nothing from Christus Health Southeast Texas d/b/a Christus Hospital—St. Mary.

REVERSED AND RENDERED.

---

**3.** St. Mary's raised issues concerning a jury instruction on settlement credit and the factual sufficiency of the evidence supporting the jury's award of $200,000 in pecuniary loss to one of Stacy's two children.