

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-13-00134-CV
_____

TAMMY CROCKER, Appellant

V.

THOMAS BABCOCK, IV, M.D.,
LONGVIEW EMERGENCY MEDICINE ASSOCIATES, INC.,
AND GOOD SHEPHERD MEDICAL CENTER, Appellees

On Appeal from the 124th District Court
Gregg County, Texas
Trial Court No. 2011-2463-B

Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Justice Carter

# OPINION

Tammy Crocker brings this permissive, interlocutory appeal from the entry of summary judgment in a medical malpractice lawsuit against Thomas Babcock, IV, M.D. (Babcock), Longview Emergency Medicine Associates, Inc. (LEMA), and Good Shepherd Medical Center (Good Shepherd). The trial court found that Babcock, LEMA, and Good Shepherd were entitled to the benefit of the heightened standard of proof in cases involving emergency medical care as set forth in Section 74.153 of the Texas Civil Practice and Remedies Code. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.153 (West 2011). The question before us is whether Section 74.153 applies to the facts of this case. We conclude that it does and, thus, uphold the trial court's judgment.

## I.     Background

Crocker, a forty-six-year-old woman, began having physical problems described by her husband, an emergency medical technician, as classic stroke symptoms. Crocker's husband called 9-1-1 at 10:33 p.m. on August 20, 2010. When the emergency medical service arrived six minutes later, they noted stroke symptoms and believed Crocker had had an acute stroke. Crocker was described as alert, but unable to speak, with facial droop and right side weakness. Crocker was airlifted to Good Shepherd in Longview at 11:09 p.m. At 11:15 p.m., an in-flight crew member notified either the emergency department charge nurse or another emergency department nurse of an inbound possible stroke patient. Although required by hospital protocol, the emergency department nurse who received the notification did not activate Good Shepherd's stroke code protocol. Crocker arrived at the hospital at 11:40 p.m.

2

Babcock was one of three emergency department physicians on duty at the time of Crocker's arrival. Because Babcock had no patients when Crocker arrived, he accompanied her to the trauma bay[1] and was briefed on her condition by the in-flight paramedic. Crocker was initially unable to move, speak, or smile, but she improved on the helicopter flight and was able to help move herself onto the gurney using her right arm and leg. Her facial droop had also improved. Babcock recognized Crocker from a previous emergency department visit on August 6, 2010, for suspected Eagle Syndrome.[2] Upon Crocker's arrival at Good Shepherd, neither Babcock nor anyone else activated the stroke code protocol, called a neurologist, or performed an NIH Stroke Scale.[3]

Emergency department triage notes indicate that at 11:44 p.m., Crocker had a limited range of motion in her right shoulder, right wrist, right knee, and right ankle. Her case was classified as "urgent." Eight minutes after Crocker arrived and after Babcock had obtained a history from Crocker, who was having difficulty speaking but could generally make herself understood, Babcock ordered a CT scan without contrast[4] of her brain. The scan results Babcock

---

[1]Babcock was not notified that a helicopter was bringing a patient into the emergency department.

[2] "Eagle syndrome is characterized by recurrent pain in the oropharynx and face due to an elongated styloid process or calcified stylohyoid ligament." Vittorio Rinaldi, M.D., *Eagle Syndrome*, MEDSCAPE, http://emedicine.medscape.com/article/1447247-overview (updated Jan. 10, 2014). We have created and will retain images of those portions of websites reviewed by this Court and referenced in this opinion. The images were captured on the date of last review.

[3]"The National Institutes of Health Stroke Scale (NIHSS) is a systematic assessment tool that provides a quantitative measure of stroke-related neurologic deficit." Introductory material, NIH STROKE SCALE INTERNATIONAL, http://www.nihstrokescale.org/ (last visited Oct. 16, 2014).

[4]Babcock ordered additional tests including a comprehensive metabolic panel, a chest x-ray, an ECG, and a complete urinalysis. Medications ordered included Troponin-1, Ativan, and Geodon.

received at 12:32 a.m. were unremarkable. While the CT scan ruled out the possibility of a hemorrhagic stroke,[5] it did not rule out the possibility of an ischemic stroke. Babcock's differential diagnosis included (1) cardiovascular accident, (2) transient ischemic attack (TIA),[6] (3) dementia, and (4) paralysis.

At 12:45 a.m., Babcock consulted by telephone with Dr. Rajani Ruth Caesar, a neurologist, about the possibility of administering tissue plasminogen activator (tPA).[7] However, given Crocker's waning symptoms and apparent rapid improvement from the initial call, Babcock felt that tPA administration was not indicated. Babcock believed the rapid improvement in Crocker's symptoms indicated that she did not have an acute ischemic stroke. Rapidly improving symptoms are exclusion criteria for tPA administration. At 1:45 a.m., the three-hour window for administering tPA expired.

Crocker was still in the emergency department at 2:31 a.m. when Babcock changed his diagnosis of her condition to acute, non-hemorragic cardiovascular accident. It is unclear what prompted Babcock to settle on this diagnosis. At 2:47 a.m., emergency department care was

---

[5]"A hemorrhagic stroke occurs when a blood vessel in part of the brain becomes weak and bursts open. This causes blood to leak into the brain." MedlinePlus, *Stroke*, U.S. NAT'L LIBR. MED. NAT'L INSTS. HEALTH, http://www.nlm.nih.gov/medlineplus/ency/article/000726.htm (updated May 28, 2014).

[6]"A transient ischemic attack (TIA) occurs when blood flow to a part of the brain stops for a brief time. A person will have stroke-like symptoms for up to 24 hours. In most cases, the symptoms last for 1 to 2 hours. . . . A TIA is different than a stroke. After a TIA, the blockage breaks up quickly and dissolves. A TIA does not cause brain tissue to die." MedlinePlus, *Transient Ischemic Attack*, U.S. NAT'L LIBR. MED. NAT'L INSTS. HEALTH, http://www.nlm.nih.gov/medlineplus/ency/article/000730.htm (updated May 28, 2014).

[7]"Thrombolytic therapy is the use of drugs to break up or dissolve blood clots, which are the main cause of both heart attacks and stroke. Thrombolytic medications are approved for the immediate treatment of stroke and heart attack. The most commonly used drug for thrombolytic therapy is tissue plasminogen activator (tPA), but other drugs can do the same thing." MedlinePlus, *Thrombolytic Therapy*, U.S. NAT'L LIBR. MED. NAT'L INSTS. HEALTH, http://www.nlm.nih.gov/medlineplus/ency/article/007089.htm (updated May 13, 2014).

4

completed, and Crocker was admitted to the hospital. Crocker was ultimately diagnosed with an "acute [cerebral vascular accident]" with a "[l]arge area of acute ischemia."[8] Crocker alleges that she continues to experience neurological deficits resulting from the stroke, including right side weakness, facial droop, speech difficulties, and gait disturbance.

Crocker filed a medical negligence lawsuit based on the missed diagnosis and failure to treat her stroke. In response, Babcock, LEMA, and Good Shepherd claimed that they were providing emergency medical care to Crocker and that their conduct should therefore be governed by the willful and wanton negligence standard set forth in Section 74.153 of the Texas Civil Practice and Remedies Code. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.153.

Because Babcock, LEMA, and Good Shepherd pled entitlement to the heightened standard of proof, Crocker filed a no-evidence motion for summary judgment, which claimed,

> There is no evidence that Defendants Thomas Babcock, IV, M.D., Longview Emergency Medicine Associates, Inc., Good Shepherd Medical Center or Rajani Caesar, M.D. provided bona fide emergency care services to Tammy Crocker for acute ischemic stroke. There is no evidence that:
>
> 1.  The Defendants diagnosed Tammy Crocker with acute ischemic stroke in the emergency department;
>
> 2.  The Defendants provided bona fide emergency care services for the care and treatment of acute ischemic stroke to Tammy Crocker while she was in the emergency department;
>
> 3.  Defendants provided treatment to Tammy Crocker for acute ischemic stroke while in the emergency department.

---

[8]"Ischemic stroke occurs when a blood vessel that supplies blood to the brain is blocked by a blood clot." MedlinePlus, *Stroke*, U.S. NAT'L LIBR. MED. NAT'L INSTS. HEALTH, http://www.nlm.nih.gov/medlineplus/ency/article/000726.htm (updated May 28, 2014).

Plaintiff is therefore entitled to summary judgment that as a matter of law, Defendants did not provide emergency medical care to Tammy Crocker in the emergency department on August 20, 2010.

Crocker also filed a traditional motion for summary judgment, relying upon various depositions and medical records which she claims established, as matter of law, (1) that the appellees failed to diagnose her with acute stroke while in the emergency department, (2) that the appellees did not provide bona fide emergency care for acute stroke while she was in the emergency department, and (3) that the appellees, in fact, incorrectly diagnosed her with the non-emergency conditions of anxiety and TIA. In short, Crocker claimed she only received non-emergency care in the emergency department. Consequently, her argument continues, Babcock, LEMA, and Good Shepherd were not entitled to the benefit of a heightened standard of proof. The trial court overruled both Crocker's no-evidence motion and traditional motion for partial summary judgment. In overruling Crocker's motions for partial summary judgment, the trial court made the following substantive rulings on the specific legal questions raised by the motions and the responsive pleadings:

1. Section 74.153 applies to this healthcare liability claim in which Plaintiff asserts that her acute ischemic stroke was not properly diagnosed in the emergency department;

2. Section 74.153 applies to this healthcare liability claim in which Plaintiff asserts that her acute ischemic stroke was not timely treated in the emergency department, and;

3. Section 74.153 applies to this healthcare liability claim in which Plaintiff asserts that her acute ischemic stroke was not properly treated in the emergency department.

6

Crocker brings this permissive, interlocutory appeal. *See* TEX. R. APP. P. 28.3; TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(d) (West Supp. 2014).[9]

## II.    Standard of Review

A traditional motion for summary judgment is granted only when the movant establishes that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). An appellate court conducts a de novo review of the grant or denial of a motion for summary judgment. *Id.*

To prevail on a no-evidence motion for summary judgment, the movant must first allege that there is no evidence of one or more specified elements of a claim or defense on which the non-movant would have the burden of proof at trial. *Sudan v. Sudan*, 199 S.W.3d 291, 292 (Tex. 2006) (per curiam); *see* TEX. R. CIV. P. 166a(i). A non-movant will defeat a no-evidence summary judgment motion if the non-movant presents more than a scintilla of probative evidence on each element of his or her claim. *Galindo v. Snoddy*, 415 S.W.3d 905, 911 (Tex. App.—Texarkana 2013, no pet.); *Price v. Divita*, 224 S.W.3d 331, 336 (Tex. App.—Houston [1st Dist.] 2006, pet. denied). More than a scintilla of evidence exists when the evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997). Less than a scintilla of evidence exists when the evidence is "'so weak as to do no more than create a mere surmise or

[9]In its order denying Crocker's motions for partial summary judgment and order permitting an interlocutory appeal pursuant to Section 51.014(d) of the Texas Civil Practice and Remedies Code, the trial court specifically found that its order "involve[d] controlling questions of law as to which there is a substantial ground for difference of opinion . . . ." The trial court further found that "an immediate interlocutory appeal of [its] Order may materially advance the ultimate termination of this litigation . . . ." *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(d).

suspicion of a fact.'"  *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003) (quoting

*Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)).

**III.    Section 74.153 of the Texas Civil Practice and Remedies Code Applies to Crocker's Claims**

When it passed Chapter 74 of the Texas Civil Practice and Remedies Code, the Texas

Legislature made a number of changes to the "good Samaritan laws" by addressing the liability

exposure of physicians and other health care providers who render emergency care.  Michael S.

Hull et al., *House Bill 4 and Proposition 12:  An Analysis with Legislative History, Part Three*,

36 TEX. TECH L. REV. 169, 264 (2005).  "The changes attempt to address concerns about access

to emergency care and how the threat of lawsuits had discouraged some physicians and other

providers from providing emergency care services."  *Id*.   Part of the health care crisis

precipitating the passage of House Bill 4 was the lack of adequate physician coverage in hospital

emergency rooms.  *See Gardner v. Children's Med. Ctr. of Dallas*, 402 S.W.3d 888, 893 (Tex.

App. Dallas—2013, no pet.).   Proponents of House Bill 4 argued that emergency room

physicians were required to treat anyone who presented to the emergency room "without benefit

of medical history, and under extreme time pressure."  *Id*. (citing House Comm. on Civil

Practices, Bill Analysis, Tex. H.B. 4, 78th Leg., R.S. (2003)).

As a result of these concerns, the Texas Legislature passed Section 74.153, entitled

"Standard of Proof in Cases Involving Emergency Medical Care."  This section provides,

> In a suit involving a health care liability claim against a physician or health care
> provider for injury to or death of a patient arising out of the provision of
> emergency medical care in a hospital emergency department or obstetrical unit or
> in a surgical suite immediately following the evaluation or treatment of a patient
> in a hospital emergency department, the claimant bringing the suit may prove that

the treatment or lack of treatment by the physician or health care provider departed from accepted standards of medical care or health care only if the claimant shows by a preponderance of the evidence that the physician or health care provider, with *wilful and wanton negligence*, deviated from the degree of care and skill that is reasonably expected of an ordinarily prudent physician or health care provider in the same or similar circumstances.

TEX. CIV. PRAC. & REM. CODE ANN. § 74.153 (emphasis added).

It is uncontested that Crocker suffered from an acute ischemic stroke. While Crocker was technically diagnosed with having suffered from an acute, non-hemorrhagic, cardiovascular accident while still in the emergency department, she was discharged from the department only fifteen minutes after that diagnosis was made. Crocker did not receive tPA for this condition while in the emergency department. Based on these facts and the facts previously stated, Crocker contends that Section 74.153 does not apply and that the appellees are not entitled to the benefit of the wilful and wanton negligence standard.

A similar argument was made in *Turner v. Franklin*, 325 S.W.3d 771 (Tex. App.—Dallas 2010, pets. (2) denied), when the Dallas Court of Appeals became the first Texas appellate court to squarely address this provision. In *Franklin*, a fourteen-year-old boy presented to the emergency department with severe pain in his lower abdominal region and a swollen left testicle. Franklin, the emergency department physician, diagnosed the boy with epididymitis and prescribed pain medication and antibiotics. *Id*. at 775. In fact, the boy was suffering from testicular torsion, which was never treated. Because the testicular torsion was left untreated, removal of the testicle was ultimately required. *Id*.

In the ensuing medical negligence lawsuit, Franklin filed a motion for summary judgment claiming the evidence proved as a matter of law that his conduct did not rise to the level of wilful

9

and wanton conduct required by Section 74.153. *Id.* The Turners argued that Section 74.153 did not apply because none of the defendants provided "emergency medical care" to their son. *Id.* Instead, the Turners claimed their son was diagnosed with and treated for a non-emergency condition. *Id.* at 776. In ruling against the Turners, the Dallas court stated, "Even though the summary judgment evidence indicates K.M.T.'s condition was diagnosed and treated as a non-emergency, we conclude the Turners' claims arise from the provision of 'emergency medical care' within the meaning of section 74.153." *Id.* at 774.

In arriving at this conclusion, the court analyzed the statutory definition of "emergency medical care," which states,

> [B]ona fide emergency services provided after the sudden onset of a medical or traumatic condition manifesting itself by acute symptoms of sufficient severity, including severe pain, such that the absence of immediate medical attention could reasonably be expected to result in placing the patient's health in serious jeopardy, serious impairment to bodily functions, or serious dysfunction of any bodily organ or part. The term does not include medical care or treatment that occurs after the patient is stabilized and is capable of receiving medical treatment as a nonemergency patient or that is unrelated to the original medical emergency.

TEX. CIV. PRAC. & REM. CODE ANN. § 74.001(a)(7) (West Supp. 2014). The *Turner* court next utilized the Legislature's definition of "medical care" to help define the phrase "bona fide emergency services."

Section 74.001(a)(19) of the Texas Civil Practice and Remedies Code defines "medical care" as

> any act defined as practicing medicine under Section 151.002, Occupations Code, performed or furnished, or which should have been performed, by one *licensed to practice medicine* in this state for, to, or on behalf of a patient during the patient's care, treatment, or confinement.

10

TEX. CIV. PRAC. & REM. CODE ANN. § 74.001(a)(19) (West Supp. 2014) (emphasis added).

Section 151.002(a)(13) of the Texas Occupations Code defines "practicing medicine" as

> the diagnosis, treatment, or offer to treat a mental or physical disease or disorder or a physical deformity or injury by any system or method, or the attempt to effect cures of those conditions, by a person who:
>
> (A)    publicly professes to be a physician or surgeon; or
>
> (B)    directly or indirectly charges money or other compensation for those services.

TEX. OCC. CODE ANN. § 151.002(a)(13) (West Supp. 2014). To these definitions, the *Turner* court added a good-faith element, so that under *Turner*, "bona fide emergency services" are defined as "any actions or efforts undertaken in a good faith effort to diagnose or treat a mental or physical disease or disorder or a physical deformity or injury by any system or method, or the attempt to effect cures of those conditions." *Turner*, 325 S.W.3d at 778. When this definition is inserted into the definition of emergency medical care, emergency medical care means

> **any actions or efforts undertaken in a good faith effort to diagnose or treat a mental or physical disease or disorder or a physical deformity or injury by any system or method, or the attempt to effect cures of those conditions**, provided after the sudden onset of a medical or traumatic condition manifesting itself by acute symptoms of sufficient severity, including severe pain, such that the absence of immediate medical attention could reasonably be expected to result in placing the patient's health in serious jeopardy, serious impairment to bodily functions, or serious dysfunction of any bodily organ or part. The term does not include medical care or treatment that occurs after the patient is stabilized and is capable of receiving medical treatment as a nonemergency patient or that is unrelated to the original medical emergency.

*Id.*; TEX. CIV. PRAC. & REM. CODE ANN. § 74.001(a)(7) (emphasis added). The *Turner* court utilized the emphasized portion of this definition in lieu of the phrase "bona fide emergency services." Further, the *Turner* court interpreted the phrase "good faith effort," which appears in

11

the first part of this definition, and the phrase "bona fide," defined as a Latin phrase meaning "in good faith," synonymously. *Turner*, 325 S.W.3d at 778 (citing BLACK'S LAW DICTIONARY 168 (7th ed. 1999)). While *Turner* recognized that "bona fide" sometimes means "actual" or "real," the court found nothing to compel the conclusion that the Legislature intended "bona fide" to mean actual or real in this context. *Id.* Therefore, under *Turner*, "any actions or efforts undertaken in a good faith effort to diagnose or treat a mental or physical disease or disorder or a physical deformity or injury by any system or method, or attempt to effect cures to those conditions," provided "during the time period and under the circumstances specified in section 74.001(a)(7), . . . constitute 'emergency medical care' within the meaning of [the statute]." *Id.* "Because 'medical care' includes the diagnosis of any disease or injury," the court rejected the contention that "'bona fide emergency services' does not include the diagnosis of a non-emergency condition." *Id.* at 779. The court therefore held that because the Turners' claims were for injuries arising out of the provision of emergency medical care within the meaning of Section 74.001(a)(7), the wilful and wanton negligence standard applied.

Crocker is critical of *Turner*, complaining that, among other things, it ignored the fact that the definition of "medical care" is modified by the term "emergency." *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.001(a)(7). Because the statute requires that the medical care also be "emergency" care, Crocker contends that *Turner*'s definition of "bona fide emergency services" is erroneous. Additionally, Crocker argues that the *Turner* decision does not require the actual provision of "emergency services" for the statute to apply.

12

Conversely, Babcock, LEMA, and Good Shepherd rely on *Turner* to support their position that the wilful and wanton standard applies, as a matter of law, on the facts presented here.[10]  Because we disagree with the *Turner* analysis, we decline to follow it.

We likewise decline to apply Crocker's suggested definition of "emergency services,"[11] taken from Section 311.021 of the Texas Health and Safety Code, which states,

> In this subchapter, "emergency services" means services that are usually and customarily available at a hospital and that must be provided immediately to:
>
> (1)    sustain a person's life;
>
> (2)    prevent serious permanent disfigurement or loss or impairment of the function of a body part or organ; or
>
> (3)    provide for the care of a woman in active labor or, if the hospital is not equipped for that service, to provide necessary treatment to allow the woman to travel to a more appropriate facility without undue risk of serious harm.

TEX. HEALTH & SAFETY CODE ANN. § 311.021 (West 2010) (Chapter 311 is captioned "Powers and Duties of Hospitals").  Utilizing this definition, Croker contends the wilful and wanton standard is limited to health-care liability claims in which the patient presents with an emergency medical condition, the emergency medical condition is actually diagnosed, and the emergency medical condition is actually treated by providing emergency services usually and customarily available at the hospital.

Section 74.001(b) provides, "Any legal term or word of art used in this chapter, not otherwise defined in this chapter, shall have such meaning as is consistent with the common

---

[10]There is no agreed stipulation of facts.

[11]Chapter 74 of the Texas Civil Practice and Remedies Code does not define "emergency services."

law." TEX. CIV. PRAC. & REM. CODE ANN. § 74.001(b) (West Supp. 2014). The definition of "emergency services" in the Health and Safety Code derives from a statutory scheme generally addressing the powers and duties of hospitals. The portion of the statute defining "emergency services" is specifically intended to address the problem of discrimination in the denial of those services. *See* TEX. HEALTH & SAFETY CODE ANN. § 311.022 (West 2010). This section prohibits and, in fact, criminalizes the refusal of emergency medical service by a hospital, its medical staff, employees, or officers, based on indigence, race, religion, or national ancestry. *Id.* The definition of "emergency services," for purposes of this statute, was apparently narrowly drawn to address the issue of patient dumping, that is, the practice of refusing to treat patients who, among other things, are unable to pay. We thus conclude that this statutory definition is not in keeping with the common law. We, therefore, decline to adopt this definition for the purpose of determining whether emergency services were provided to Crocker under Section 74.001(a)(7). *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.001(a)(7). Instead, we examine the context in which the emergency department care was provided to determine whether Crocker received actual emergency services.

Here, there is no dispute regarding the circumstances under which Crocker presented to the Good Shepherd emergency department. Crocker was air-lifted to the hospital for emergency medical evaluation and treatment due to the sudden onset of measurable neurological deficits after having collapsed to the floor of her home. The absence of immediate medical attention for this condition "could reasonably be expected to result in placing the patient's health in serious jeopardy, serious impairment to bodily functions, or serious dysfunction of any bodily organ or

14

part." TEX. CIV. PRAC. & REM. CODE ANN. § 74.001(a)(7). Crocker, thus, presented with the type of medical condition—a possible stroke—that Section 74.153 was designed to address.[12]

On her arrival in the emergency department, the Good Shepherd nursing staff:

- triaged Crocker's case as urgent;

- immediately placed Crocker in an examination room for evaluation of stroke symptoms;

- obtained a medical and surgical history;

- monitored Crocker's vital signs; and

- carried out Babcock's orders relative to testing and to the administration of medication.

These nursing functions were taken in immediate response to the sudden onset of Croker's manifest medical condition and were part and parcel of the actual emergency services provided to Crocker in the emergency department.[13]

---

[12]Babcock and Good Shepherd's expert, Dr. Ross L. Levine, testified that Crocker presented with an emergency.

[13]In addition to *Turner*, Good Shepherd also relies on the Beaumont court's opinion in *Christus Health Southeast Texas v. Licatino*, 352 S.W.3d 556 (Tex. App.—Beaumont 2011, no pet.), for the proposition that its nurses provided emergency medical care in this case and are, therefore, entitled to the protection of Section 74.153. *Licatino* involved the appeal of a judgment against the hospital after a jury trial in which the jury was instructed in accordance with Section 74.153. It did not, as in this case, involve the legal question of whether the nurses were entitled to the benefit of that provision.

In *Licatino*, Meaux Licatino died of a heart attack hours after her discharge from the emergency room. *Id.* at 557. The evidence showed that the nurses deviated from the hospital's procedures for the assessment and treatment of chest pain and failed to detect certain indicators of cardiac chest pain which could have resulted in a proper diagnosis. *Id.* at 562. Because the nurses provided emergency medical care in a hospital emergency room, Licatino was required to prove they deviated from the standard of care with wilful and wanton negligence. *Id.* That emergency medical care consisted of triaging Licatino immediately on arrival at the hospital and assigning an urgent status to her case. *Id.* Licatino "was taken to the treatment room and seen by the treating physician in approximately one-half hour." *Id.* Here, Crocker was triaged by hospital nurses and seen by Babcock immediately on her arrival.

15

Crocker contends, though, that the hospital's failure to initiate its stroke code protocol in accordance with hospital policy[14] necessarily means it failed to provide her with any emergency services. According to Caesar, Good Shepherd's stroke program director and author of the hospital's stroke policies, when emergency medical services personnel suspect a stroke, they are to alert the emergency department en route to the hospital. That was done in this case. On receipt of such a call, hospital policy requires activation of the stroke team so that its members can be assembled before the patient arrives. This step was not taken. The policies place the primary responsibility for carrying out the acute stroke protocol on the emergency department physician and the neurologist, rather than the nurses. These policies generally require rapid patient assessment and administration of emergency medical care services to be provided to the patient for the diagnosis and treatment of acute ischemic stroke. While the failure to initiate stroke code protocol in this circumstance might have been poor practice, this failure does not change the fact that the hospital took immediate action responsive to Crocker's medical condition, as outlined above.

In summary, we conclude that Crocker presented the medical staff with an emergency condition and that she was provided emergency services. We, therefore, conclude that the determination of whether Good Shepherd deviated from the degree of care and skill that is reasonably expected of an ordinarily prudent health care provider is to be made in accordance with Section 74.153. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.153.

---

[14]Good Shepherd earned the Gold Seal of Approval in 2010 from the Joint Commission for Primary Stroke Centers. The stroke program at Good Shepherd includes written "procedures to be utilized and followed in the care of the stroke patient." These written procedures include "Stroke Team Roles and Responsibilities," "Acute Stroke Protocol Activation and tPA Administration for use in Acute Ischemic CVA," and "Care of the Stroke Patient."

The evidence further shows that, within eight minutes of Crocker's arrival in the emergency department, Babcock performed a physical examination and evaluation of Crocker and ordered a CT scan of her brain.[15]  When a stoke is suspected, as in this case, a CT scan should be done as soon as possible to rule out bleeding in the brain.  On receipt of the radiologist's report regarding the scan, Babcock consulted with neurologist Caesar regarding the administration of tPA.  However, due to Crocker's improving symptoms, Babcock elected not to administer tPA.

Good Shepherd's stroke diagnostics protocol includes goals of not only completing a CT scan within a short time period, but also quickly completing a chest x-ray, if indicated, and an EKG.  Here, Babcock ordered a chest x-ray and an ECG[16] within eight minutes of Crocker's arrival in the emergency department, at the same time the CT scan was ordered.  These facts indicate that Babcock took immediate action calculated to diagnose Crocker's suspected stroke after "the sudden onset of [her] medical or traumatic condition manifesting itself by acute symptoms of sufficient severity . . . such that the absence of immediate medical attention could reasonably be expected to result in placing [Crocker's] health in serious jeopardy, serious impairment to bodily functions, or serious dysfunction of any bodily organ or part."  TEX. CIV. PRAC. & REM. CODE ANN. § 74.001(a)(7).  Although Crocker complains that Babcock did not administer tPA, the question of whether this medical judgment fell below the appropriate standard of care is not before this Court.  We simply must determine whether the evidentiary

---

[15]Babcock also ordered an ECG, blood tests, and a chest x-ray.

[16]"An electrocardiogram . . . is a . . . test that records the heart's electrical activity."  It is referred to either as an EKG or an ECG.  *What Is an Electrocardiogram?*, NAT'L HEART, LUNG & BLOOD INST. NAT'L INSTS. HEALTH, http://www.nhlbi.nih.gov/health/health-topics/topics/ekg/ (last revised Oct. 01, 2010).

standard of proof in this emergency department case should be governed by Section 74.153. And, in light of the immediate action taken with the purpose of diagnosing Crocker's suspected stroke, we conclude that the standard of proof applicable to those actions is governed by Section 74.153. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.153.

## IV. Conclusion

We affirm the trial court's judgment.

Jack Carter
Justice

Date Submitted:     September 24, 2014
Date Decided:       October 21, 2014

18