**THIRD DIVISION**
**BARNES, P. J.,**
**BOGGS and BRANCH, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules/

**November 20, 2014**

# In the Court of Appeals of Georgia

A14A0866.   HOSPITAL   AUTHORITY   OF   VALDOSTA/
LOWNDES COUNTY et. al v. BRINSON.

BARNES, Presiding Judge.

This medical malpractice case addresses the applicability of the emergency room (ER) statute, OCGA § 51-1-29.5, which requires a plaintiff to show clear and convincing evidence of gross negligence to recover for claims arising out of the provision of emergency medical care. The trial court in this case granted partial summary judgment to the plaintiff, finding that the ER statute did not apply because the patient had been stable and non-urgent when seen and received no emergency care.

The defendants appealed, arguing that the "actual condition" of the plaintiff is determinative and that the trial court erred in "relying on the subjective belief" of the

plaintiff that the baby who presented to the ER only had a cold when the evidence establishes that the baby had a "life-threatening medical condition." Because the baby needed emergency medical care he did not receive, they argue, they are entitled as a matter of law to the greater protection of the ER statute.

We agree that the trial court erred in holding that the ER statute does not apply as a matter of law, and therefore reverse the grant of partial summary judgment to the plaintiff. We affirm the trial court's denial of summary judgment to the defendants, however, finding a question of fact exists for a jury to determine whether the gross negligence standard of the ER statute applies in this case, and whether the defendants breached whatever standard of care the jury finds applicable.

1. As an initial matter, we note that the plaintiff devotes much of her brief to arguing that the defendants must automatically lose because they did not designate the entire record in their notice of appeal, omitting at least three depositions despite the trial court's recitation that it had reviewed all of the record before granting partial summary judgment to the plaintiff.[1] Additionally, the plaintiff correctly notes that the

---

[1]Those depositions are of the plaintiff's expert registered nurse, expert physician's assistant, and expert physician, all of whom opine that the defendants were deficient in their ER assessment and treatment of the baby. The amended notice of appeal properly lists items to be omitted from the appellate record; the only items subsequently transferred from the trial court are the three depositions.

2

defendants' notice of appeal was not in proper form because they designated items to be *included* in the record rather than those to be *omitted* as directed by OCGA § 5-6-37.

The defendants subsequently moved this Court for permission to supplement the record with the three omitted depositions, admitting that the depositions had been filed with the trial court before it issued the order on appeal. They further argued that the supplementation would cause no delay and would cure any perceived defect in the record and allow this appeal to be decided on the merits. This Court granted the motion over the plaintiff's procedural objection. At oral argument, the plaintiff further objected to this Court's grant of the defendants' motion to supplement the record.

"It is well-settled that, on appeal, the burden is on the appellant to establish error." (Citation and punctuation omitted.) *Miller Grading Contractors v. Ga. Fed. Savings & Loan Assn.*, 247 Ga. 730, 734 (3) (279 SE2d 442) (1981).

> [F]or the appellate court to determine whether the grant of summary judgment was erroneous, the appellant must include in the record those items which will enable the appellate court to ascertain whether a genuine issue of material fact remains or, if the record establishes there is no such issue of fact, whether the moving party is entitled to judgment as a matter of law.

3

*Brown v. Frachiseur*, 247 Ga. 463, 464 (277 SE2d 16) (1981). This Court has previously held that when a trial court states that it considered the entire record and an appellant omits some portion of the evidence upon which the court relied, we must affirm the trial court. See, e.g., *Hooks v. Humphries*, 303 Ga. App. 264, 268 (3) (692 SE2d 845) (2010); *Armstrong v. Rapson*, 299 Ga. App. 884, 885 (683 SE2d 915) (2009); *Advanced Elec. Sys. v. Turkin*, 288 Ga. App. 799, 800 (655 SE2d 685) (2007); *Roach v. Roach*, 237 Ga. App. 264, 265 (514 SE2d 44) (1999); *Regency Executive Plaza &c. v. Wilmock, Inc.*, 237 Ga. App. 193, 194-195 (514 SE2d 446) (1999). We have also held more specifically that when the evidence omitted is something upon which the appellant relies in arguing on appeal that a material issue of fact exists, we must assume that the trial court's judgment was correct. *Ferros v. Ga. State Patrol*, 211 Ga. App. 50, 51-52 (2) (438 SE2d 163) (1993) (omission of depositions that appellant cited in appellate brief required affirming trial court order).

On the other hand, "[i]t is permissible for an appellant to submit only a portion of the record below to this court," although he remains obliged to demonstrate error by the record and cannot omit portions of the record that are material to deciding the specific issues raised on appeal. *Rohatensky v. Woodall*, 257 Ga. App. 801, 802 (1) (572 SE2d 354) (2002). Further, OCGA § 5-6-48 (d) grants this Court the authority,

4

with or without a motion, to "require that additional portions of the record or transcript of proceedings be sent up . . . or take any other action to perfect the appeal and record so that the appellate court can and will pass upon the appeal and not dismiss it." We exercised our statutory discretion in this case and granted the defendants' motion to amend their notice of appeal and forward to this court the three depositions that were not previously included in the appellate record. Transcripts of those three depositions were subsequently forwarded to this court. Accordingly, we will address the merits of this appeal rather than automatically affirm the trial court without analysis because the defendants initially omitted deposition transcripts from the plaintiff's three expert witnesses.

2. An appellate court's "review of the grant or denial of summary judgment is de novo, and we view the evidence, and all reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmovant." *Abdel-Samed v. Dailey*, 294 Ga. 758, 760 (1) (755 SE2d 805) (2014). In this case, both parties moved for summary judgment, and do not appear to dispute the basic underlying facts, only the application of law to those facts. That law provides,

> In an action involving a health care liability claim arising out of the
> provision of emergency medical care in a hospital emergency

5

department . . . immediately following the evaluation or treatment of a patient in a hospital emergency department, no physician or health care provider shall be held liable unless it is proven by clear and convincing evidence that the physician or health care provider's actions showed *gross negligence*.

OCGA § 51-1-29.5 (c) (emphasis supplied).

The statute defines "emergency medical care" as

bona fide emergency services provided after the onset of a medical or traumatic condition manifesting itself by acute symptoms of sufficient severity, including severe pain, such that the absence of immediate medical attention could reasonably be expected to result in placing the patient's health in serious jeopardy, serious impairment to bodily functions, or serious dysfunction of any bodily organ or part.

OCGA § 51-1-29.5 (a) (5). The statute further specifically includes from the definition of emergency medical care "care or treatment that occurs after the patient is stabilized and is capable of receiving medical treatment as a nonemergency patient or care that is unrelated to the original medical emergency." Id. Finally, in a medical malpractice case arising out of ER care, the statute directs the trial court to instruct the jury to consider:

(1) Whether the person providing care did or did not have the patient's medical history or was able or unable to obtain a full medical history,

6

including the knowledge of preexisting medical conditions, allergies, and medications;

(2) The presence or lack of a preexisting physician-patient relationship or health care provider-patient relationship;

(3) The circumstances constituting the emergency; and

(4) The circumstances surrounding the delivery of the emergency medical care.

The defendants in this case contend that the plaintiff must show by clear and convincing evidence that they were grossly negligent because she brought her baby to the ER, he was triaged in the ER, and her experts say the baby needed immediate care. In contrast, the plaintiff contends she must show only regular negligence because, upon presentation to the ER, her baby was not suffering from an acute medical issue requiring immediate medical care and received no emergency care from the defendants.

Whether the gross negligence standard of OCGA § 51-1-29.5 (c) applies here depends on whether the baby was suffering from a medical condition that was manifested "by acute symptoms of sufficient severity, including severe pain, such that the absence of immediate medical attention could reasonably be expected to" seriously jeopardize the baby's health or seriously impair his bodily functions, organs, or parts. OCGA § 51-1-29.5 (a) (5). A review of the record reveals that whether the

7

baby's medical condition was manifested by acute symptoms of sufficient severity that the health care providers should have rendered emergency care is a question that must be determined by the trier of fact.

Evidence in the record establishes that on June 30, 2010, Kurrenci Brinson was born more than two months early and weighed four pounds at birth. On August 7, 2010, the baby was seen by a pediatrician in the Youth Care department of South Georgia Medical Center (the hospital) and admitted to the hospital for treatment of pneumonia. Pediatricians staff the hospital Youth Care department, which has its own ER, but when the mother brought the baby to the hospital at 10 pm on September 24, 2010, Youth Care was closed.

The mother brought him to the hospital ER because, she testified, "he was a little fussy, and he was running a fever." He was normally not a fussy baby but that day, his mother said, "[h]e was doing a lot more crying than normal," and the child's sitter had reported that the previous day the baby had a fever, diarrhea, poor oral intake, was sleeping more than normal, and had been cringing as if his belly hurt.

ER triage nurse Bonita Werts testified that while the mother told her about the baby's symptoms, when she saw him he was playing with his mother and not crying or doing anything abnormal. When Werts examined him she thought he appeared to

8

be a "normal baby." He had urinated recently, had not vomited, his skin looked fine, his temperature was 99.2, which was not technically a fever, and he was smiling and acting appropriately, so after five minutes she assessed him as "4-Non-urgent" and took him into a "fast track" room to be seen by the physician's assistant.

The nurse explained that patients were sent to "fast track" if they were "stable 3s to 4s and 5s" based on their assessed acuity levels. A patient's acuity level could range from 1, which was life-threatening, to 5, which was "non-emergent," and the level was measured based on the kinds of resources that the patient would require, such as IV injections, traction, CT scans, and other tests. Werts did not note in the baby's history that he was premature, or that he had been admitted to the hospital a month earlier with pneumonia.

Physician's assistant Bryan Shiver saw the baby next and testified in deposition that "he was a pretty healthy, normal child." A physical examination revealed nothing unusual, and after spending eight minutes with the baby, Shiver diagnosed him as having allergic rhinitis or a cold. He prescribed an oral steroid medication and discharged the baby with instructions for the mother to make an appointment with the baby's doctor to follow up in three days. Supervising physician Wilfredo Rios reviewed the baby's chart five hours later, and although he personally would not have

9

prescribed a steroid to treat an infant with a common cold, he co-signed the chart, agreeing with Shiver's assessment and prescribed course of treatment.

The mother returned to the hospital three days later as directed, and the baby was seen by a pediatrician in Youth Care. At that time the baby had a fever of 102.1, diarrhea, vomiting, and abdominal pain. He was given Tylenol and an antibiotic, and after his blood and urine were collected for testing, he was diagnosed as having a urinary tract infection and discharged with a prescription for another antibiotic, Tylenol, and Prednisolone.

The next day, September 28, 2010, a hospital representative called the mother and told her to bring the child back to the hospital immediately because the blood work had revealed a systemic infection. When the mother received the call, she was already on her way back to the hospital to meet the baby and his sitter, who had reported that the baby had been crying and shaking. The baby was admitted to the hospital and was transferred the next day to a pediatric intensive care unit at another hospital, where he was diagnosed as having streptococcus meningitis and a stroke that paralyzed his right side. The mother subsequently sued the hospital and the ER personnel, contending that when the baby first went to the ER on September 24, 2010,

10

he had a systemic bacterial infection that, left untreated, infected his brain and caused permanent mental and physical injuries.[2]

One of the mother's experts, pediatric emergency room physician Javier Escobar, testified in deposition that a patient younger than three months should never be "fast-tracked" in an emergency room, because children that age did not have a properly developed immune system and could not localize infections well. Further, the difference between a baby 35 days old, as this one was based on his gestational or developmental age, and 85 days old, which was his chronological age, was "huge" as far as his ability to handle infections, according to Escobar. A baby younger than six weeks, or a neonate, was by definition "immunocompromised," meaning his immune system would not respond properly to infections. Thus, Escobar testified, in his opinion it was "grossly negligent" to have triaged the baby as "nonemergent" acuity level 4 instead of as a high-risk acuity level 2. Regardless of the fact that the baby had no fever when he was triaged, the mother had reported symptoms consistent with an infection that should have been investigated, he said.

---

[2]The plaintiff, Patreace Brinson, brought suit individually and as mother and natural guardian of Kurrenci Moore, a minor, against the Hospital Authority of Valdosta/Lowndes County d/b/a South Georgia Medical Center, Emergency Medicine South, LLC, Bonita Werts, R.N., Bryan Shiver, P.A., and Wilfredo Rios, M.D.

Escobar opined that while the baby was not in "dire straits," was not about to die, and was not toxic when he first came to the ER, based on his age and history, he should have received a full septic work-up including blood and urine analysis and cultures and possibly a spinal tap depending on the blood work results. He believed that when first seen, the baby had early stages of Group B streptococcus bacteremia, meaning the bacteria was floating in his bloodstream and had not yet seeded to an area outside the blood, such as the brain or lungs, which was when the situation became critical due to sepsis. Sepsis occurs when cells are no longer getting necessary oxygen as the result of a full-blown systemic infection, and that is when the patient begins to crash, he testified. It may take days for bacteremia to develop into septicemia, and depending on the results of blood work, a patient with bacteremia may be treated with an intramuscular shot of antibiotics and sent home or admitted to wait for the cultures to grow out. That is the course of treatment that was given when the baby returned three days later with a similar presentation and complaints and was seen by a Youth Care pediatrician, but by then the infection was much more advanced and the antibiotics were insufficient to stem the progress, he concluded.

Following discovery, the defendants moved for summary judgment, arguing that the heightened standard of OCGA § 51-1-29.5 (c) applies and that the mother

12

failed to introduce clear and convincing evidence that they had been grossly negligent. The mother opposed the defendants' motion and moved for partial summary judgment, arguing that the stricter standard of OCGA § 51-1-29.5 (c) does not apply in this case because the baby did not present with an emergency medical condition as defined by the statute and did not receive any emergency medical care.

> The trial court reviewed OCGA § 51-1-29.5 and noted that

> the condition in which the child presented to the emergency room is not in material dispute. The parties' deposition testimony, statements of material fact as to which there is no dispute and defendants' statement of fact in their brief, reflect the stable, non-urgent condition of Kurrenci Moore while he was in the hospital emergency room on September 24, 2010.

The court found that the record showed that "the infant presented to the emergency room in a stable, non[-]life-threatening condition, and no bona fide emergency care was provided to him by the Defendants." Therefore, the court held, the plaintiff did not have to prove by clear and convincing evidence that the defendants were grossly negligent, only whether they "breached the standard of care under which similar conditions and like surrounding circumstances is ordinarily employed by the medical profession generally."

13

The defendants contend on appeal that the trial court erred in granting partial summary judgment to the plaintiff and denying summary judgment to them. They argue that the gross negligence standard of OCGA § 51-1-29.5 (c) applies as a matter of law because the record contains evidence that the baby was "actually suffering from an emergency medical condition at the time of the [defendants'] care" instead of the cold he was treated for, and further argue that the baby's "actual condition" is dispositive. [3]

While the defendants further argue on appeal, as they did in the trial court, that the plaintiff has taken "the unequivocal position that [the baby] had a 'very common cold'" when he first came to the ER, that summation misrepresents the plaintiff's argument. The plaintiff argued in her motion for summary judgment that the ER statute does not apply in this case because the baby was stable when he came to the ER, he was *treated* for a cold, and he received no emergency services. All of the

---

[3]While the defendants argued in the trial court that the plaintiff failed to establish by clear and convincing evidence that they were grossly negligent and were therefore entitled to a complete summary judgment, on appeal they only argue that the gross negligence standard applies as a matter of law, and not that the plaintiff failed as a matter of law to present clear and convincing evidence that they were grossly negligent.

defendant health care providers testified that the baby was not "emergent"[4] when he was seen, and a pediatric infection disease physician testified that when the baby came to the ER, "clearly at that moment he was stable" as opposed to emergent, although his condition was urgent. The quotations the defendants cite from the plaintiff's trial court brief are summaries of the defendants' deposition testimony, not statements by the plaintiff attesting to the baby's "true" condition. In her appellate brief, the plaintiff does not argue that the baby had only a benign common cold when he came to the ER. She argues instead that the statute does not apply because the baby's condition was not emergent at that time but instead was stable upon presentation and remained stable throughout the ER visit.

---

[4]"Emergent" is defined as "calling for prompt or urgent action," as opposed to "urgent," meaning "very important and needing immediate attention." Merriam Webster Online, Retrieved October 29, 2014, from http://www.merriam-webster.com/dictionary/emergent, http://www.merriam-webster.com/dictionary/urgent.

15

Georgia's appellate courts have issued eight opinions in the past two years addressing the application of OCGA § 51-1-29.5 and issued a ninth case in 2008.[5] These cases have defined the parameters of current emergency room medicine law.

None of the cases have addressed the precise issue here, which is whether the gross negligence provision of OCGA § 51-1-29.5 (c) ER statute applies to a stable, immunocompromised patient who comes to the ER with indications of an infection but receives no emergency care. The defendants argue that the statute describes only two mutually exclusive scenarios: either (1) the ER patient had an emergent, life-threatening condition, or (2) the patient had a previous life-threatening condition but had become stable. A patient cannot be both stable *and* have a life-threatening condition that should have been treated immediately, they contend, or the statute "would both apply and not apply at the same time."

---

[5] *Abdel-Samed v. Dailey*, 294 Ga. 758, affirming *Dailey v. Abdul-Samed*, 319 Ga. App. 380 (736 SE2d 142) (2012) (physical precedent only); *Johnson v. Omondi*, 294 Ga. 74 (751 SE2d 288) (2013), reversing *Johnson v. Omondi*, 318 Ga. App. 787 (736 SE2d 129) (2012); *Nisbet v. Davis*, 327 Ga. App. 559 (760 SE2d 179) (2014); *Quinney v. Phoebe Putney Mem. Hosp.*, 325 Ga. App. 112 (751 SE2d 874) (2013); *Howland v. Wadsworth*, 324 Ga. App. 175 (749 SE2d 762) (2013); *Bonds v. Nesbitt*, 322 Ga. App. 852 (747 SE2d 40) (2013); *Pottinger v. Smith*, 293 Ga. App. 626 (667 SE2d 659) (2008).

16

The parties agree that the baby had a medical condition when he was brought to the ER. The question is not about the baby's "actual condition" though. It is whether his medical condition was manifested by acute symptoms of sufficient severity to trigger the gross negligence standard of OCGA § 51-1-29.5 (c). The defendants argue that "the statute provides that the condition of the patient controls, not the opinion of the physician," quoting from *Bonds*, 322 Ga. App. at 855 (1). In this case, they contend, the plaintiff's experts said the baby was actually sick and that the defendants should have provided him with emergency care, and therefore the gross negligence standard of OCGA § 51-1-29.5 (c) applies.

In *Bonds*, however, as in *Abdel-Samed*, 294 Ga. at 761 (1), n. 5 and *Quinney*, 325 Ga. App. at 115-116 (1), the issue addressed is only whether the patient in those cases had stabilized and were capable of receiving care as a non-emergency patient, a statutory exclusion to the definition of "emergency care." OCGA § 51-1-29.5 (a) (5) In those three cases, our appellate courts held that, regardless of whether the defendants stopped providing emergency care, the question was not whether the patients had presented to the ER with a condition manifested by acute symptoms of sufficient severity to trigger the gross negligence statute had changed. In other words, the analysis revolved around the patient's *actual* condition rather than the defendants'

17

perception of their condition and resultant care. See also *Howland*, 324 Ga. App. at 177-178 (jury question whether patient initially assessed as "non-urgent" received "emergency medical care" or not).

In this case, the question is not whether the exception to the gross negligence standard no longer applied because the baby had stabilized. The question is whether he presented with symptoms that should have alerted the health care providers that he required emergency medical care.

In this case, the three defendant health care providers testified that the baby was stable and was triaged and treated appropriately. Additionally, when asked in deposition whether the baby had a life-threatening emergency when he presented to the ER on September 24, 2010, the plaintiff's expert physician responded, "I believe that, without treatment at that time, the patient . . . had a serious illness in the early stages, and there was a chance to stop it. This kid had an infection, and it could have been stopped at that time." On the other hand, there was evidence that the mother reported to the health care personnel that the baby recently had a fever, diarrhea, poor oral intake, sleeping more than normal, and uncharacteristic fussiness, and that the personnel knew or should have known the baby had been born prematurely and had been hospitalized for pneumonia the previous month. Juxtaposed in this manner,

18

clearly the jury must determine genuine issues of material fact in this case in assessing whether the ER statute applies and whether the defendants met whatever standard of negligence the jury determines to be applicable.

Therefore, we conclude that the trial court erred in granting partial summary judgment to the plaintiff and in holding that the ER statute did not apply to this case as a matter of law. We also conclude that the trial court did not err in denying summary judgment to the defendants, as an issue of fact exists for the jury to determine whether the baby's claims arose out of the provision of emergency medical care and whether the plaintiff must surmount the gross negligence standard of the ER statute or whether she must show only ordinary negligence.

Accordingly, we reverse the trial court's grant of partial summary judgment to the plaintiff, and affirm the trial court's denial of summary judgment to the defendants.

*Judgment affirmed in part and reversed in part. Boggs and Branch, JJ., concur*.