S15G0621. NGUYEN et al. v. SOUTHWESTERN EMERGENCY PHYSICIANS, P.C. et al.
(779 SE2d 334)

NAHMIAS, Justice.

This case involves the application, on motion for summary judgment, of Georgia's so-called "ER statute," OCGA § 51-1-29.5, which requires that plaintiffs who bring malpractice claims based on "emergency medical care" provided in a hospital emergency department must meet a higher standard and burden of proof to prevail. In this case, the plaintiffs took their infant daughter, who had fallen off a bed, to the emergency room with what the child's mother described as a huge discolored bump on her head — a lump the size of an "apple" or "another head." The plaintiffs' lawsuit is based on allegations that the emergency room personnel committed malpractice in failing to properly evaluate the child and releasing her from the ER without diagnosing and treating her subdural hematoma and skull fracture, which led a few days later to severe brain damage. The trial court granted partial summary judgment to the plaintiffs, holding that OCGA § 51-1-29.5 did not apply to their claim, but on appeal the

Court of Appeals reversed. As explained below, we conclude that the Court of Appeals reached the right result, because the trial court misapplied OCGA § 51-1-29.5 as well as the summary judgment standard of review. We therefore affirm.

1. The record in this case shows the following. On the afternoon of July 7, 2007, Keira Pech, who was then six months old, was at her home in Albany with a babysitter when she fell off a bed and hit her head on some luggage. The babysitter called Keira's mother, Thu Carey Nguyen, and told her about the fall. Nguyen came home from work, and when she saw the large bump on the back of Keira's head, which Nguyen described in her deposition as reddish-purple in color and the size of an "apple" or "another head," she drove Keira to the emergency department at Phoebe Putney Memorial Hospital.

Khoeun Pech, Keira's father, joined them at the hospital. While they waited in the emergency room, Keira was a little fussy, crying some and sleeping some. Keira was first seen by Roy Evans, a paramedic employed by the hospital to triage patients. At about 5:50 p.m., Evans conducted an examination of Keira lasting around three minutes. At his deposition, he testified that, although he could not remember Keira's exam, he would have, by habit, palpated the area of the bump on her head, observed the way she moved her extremities, and tested if she had normal infant grasping reflexes. Evans noted on Keira's medical chart that she had a hematoma and that she did not appear to be experiencing any pain. He assigned her a priority level 4, which he said meant that "if no emergency medicine is applied, this person is not going to die or suffer serious injury." Keira was sent to the "fast track" area of the emergency department, the area for "non-emergency" patients.

Keira was then examined for about ten minutes by Michael Heyer, a physician's assistant employed by Southwestern Emergency Physicians. Heyer learned from Nguyen that Keira had fallen from a bed and hit her head. He conducted a series of routine exams, including neurological and musculoskeletal, and he testified at his deposition that based on all of the exams, Keira appeared normal, with the exception of the contusion on her head. Contrary to Nguyen's description of the size of the swelling, Heyer described it as "moderate," which he explained meant "a small area." He also noted that the child was interacting with her parents normally. Heyer concluded that Keira did not display any signs that she needed to be examined by a doctor or needed more testing, such as a skull x-ray or head CT scan. In her medical chart, Heyer recorded Keira's "symptom and problem" as "Local soft tissue swelling/injury posterior occipital scalp injury at home/environs Fall from bed." Her condition was recorded as "stable," and she was discharged from the ER at 6:10 p.m. with

instructions to return in three to five days or immediately if she started vomiting or her symptoms worsened.

Over the next two days, Keira appeared fine. On July 10, however, she stopped breathing. The babysitter called an ambulance, and Keira was taken back to Phoebe Putney. Doctors there determined that she had a skull fracture and a large subdural hematoma that was pressing on her brain, and they performed emergency surgery to relieve the pressure. Keira was then transferred to the pediatric ICU at the Medical Center of Central Georgia. A treating neurosurgeon testified in his deposition that the fluids in Keira's brain indicated that the subdural hematoma had been developing for days or weeks, and also said that he was surprised Keira had such a large skull fracture "from what was described as not much of an event." As a result of the subdural hematoma, Keira suffered severe brain damage. According to her parents' brief, she is now eight years old and unable to walk or talk.

Nguyen and Pech (collectively, "Parents"), as the parents of Keira, filed this medical malpractice lawsuit against Southwestern Emergency Physicians, Phoebe Putney, and Heyer (collectively, "Providers"), alleging that the ER health care providers failed to properly evaluate, diagnose, and treat Keira on July 7, 2007, and due to this "malpractice, negligence, and gross negligence," Keira suffered permanent brain injuries. The Parents later moved for partial summary judgment, asking the trial court to rule that OCGA § 51-1-29.5 does not apply in this case. On October 8, 2013, the trial court granted the motion, concluding that "emergency medical care" as defined in OCGA § 51-1-29.5 (a) (5) "requir[es] both the provider's belief that he was providing emergency care, and the patient's prior sudden and severe symptoms manifesting a medical or traumatic condition that objectively requires immediate medical attention," and that neither requirement was met in this case. The Providers appealed, and the Court of Appeals reversed, holding that although Keira was not diagnosed with a serious condition, there was some evidence that she had a medical condition that triggered the ER statute, so it is a question for the jury whether OCGA § 51-1-29.5 applies. See *Southwestern Emergency Physicians, P.C. v. Nguyen*, 330 Ga. App. 156, 160 (767 SE2d 818) (2014). We granted the Parents' petition for certiorari.

2. OCGA § 51-1-29.5 (c) provides that for certain health care liability claims based on "emergency medical care," health care providers will be liable only if the plaintiffs prove by "clear and convincing evidence," rather than the usual preponderance of the evidence, that the "provider's actions showed gross negligence," rather than the usual ordinary negligence. See *Johnson v. Omondi*, 294 Ga. 74, 76 (751 SE2d 288) (2013). Subsection (d) of the statute

then lists several things the jury in such a case must be instructed to consider, including whether the health care provider knew the patient's medical history or had a preexisting relationship with the patient and the circumstances of the emergency and the delivery of the emergency care.[1] To determine whether the Parents' claim in this case comes under the purview of this statute, we must examine several of the statute's elements.

(a) We look first at the location component of the ER statute. The Providers contend that all, or almost all, claims based on treatment received in an emergency room should be subject to the higher proof standards of OCGA § 51-1-29.5 (c) because the purpose of the General Assembly in enacting this provision, which was part of the Tort Reform Act of 2005, see Ga. L. 2005, p. 1, was to limit the tort exposure of health care providers in Georgia, and emergency care providers in particular. That may have been the overarching desire of many of the legislators who voted for the tort reform legislative package, but in construing the purpose of a particular statutory provision enacted into law,

> "we must presume that the General Assembly meant what it said and said what it meant." To that end, we must afford the statutory text its "plain and ordinary meaning," we must view the statutory text in the context in which it appears,

---

[1] OCGA § 51-1-29.5 (c) and (d) say in full:
(c) In an action involving a health care liability claim arising out of the provision of emergency medical care in a hospital emergency department or obstetrical unit or in a surgical suite immediately following the evaluation or treatment of a patient in a hospital emergency department, no physician or health care provider shall be held liable unless it is proven by clear and convincing evidence that the physician or health care provider's actions showed gross negligence.
(d) In an action involving a health liability claim arising out of the provision of emergency medical care in a hospital emergency department or obstetrical unit or in a surgical suite immediately following the evaluation or treatment of a patient in a hospital emergency department, the court shall instruct the jury to consider, together with all other relevant matters:
(1) Whether the person providing care did or did not have the patient's medical history or was able or unable to obtain a full medical history, including the knowledge of preexisting medical conditions, allergies, and medications;
(2) The presence or lack of a preexisting physician-patient relationship or health care provider-patient relationship;
(3) The circumstances constituting the emergency; and
(4) The circumstances surrounding the delivery of the emergency medical care.

and we must read the statutory text in its most natural and reasonable way, as an ordinary speaker of the English language would.

*Deal v. Coleman*, 294 Ga. 170, 172-173 (751 SE2d 337) (2013) (citations omitted). "[I]f the statutory text is 'clear and unambiguous,' we attribute to the statute its plain meaning, and our search for statutory meaning is at an end." Id. at 173.

It is clear that the ER statute applies only when the medical care at issue was provided "in a hospital emergency department or obstetrical unit or in a surgical suite immediately following the evaluation or treatment of a patient in a hospital emergency department." OCGA § 51-1-29.5 (c), (d). But that is not the *only* requirement for the statute to apply. If it were, the statute would have been much shorter (as would this opinion). Instead, both subsections (c) and (d) specify that they apply in "action[s] involving a health care liability claim arising out of the provision of *emergency medical care* in a hospital emergency department . . . ." And, as we will discuss next, the statute provides a definition of "emergency medical care" that requires more than simply "care provided in an emergency department."

(b) As used in OCGA § 51-1-29.5, "emergency medical care" is defined as

> bona fide emergency services provided after the onset of a medical or traumatic condition manifesting itself by acute symptoms of sufficient severity, including severe pain, such that the absence of immediate medical attention could reasonably be expected to result in placing the patient's health in serious jeopardy, serious impairment to bodily functions, or serious dysfunction of any bodily organ or part. The term does not include medical care or treatment that occurs after the patient is stabilized and is capable of receiving medical treatment as a nonemergency patient or care that is unrelated to the original medical emergency.

OCGA § 51-1-29.5 (a) (5).

In interpreting this definition, the trial court construed "bona fide emergency services" as services that are provided in "good faith," meaning that the health care provider must have had "a good faith belief that he was providing emergency care." In a decision issued after the trial court's order, however, this Court held that "bona fide emergency services," read in context, means "genuine or actual emergency services." *Abdel-Samed v. Dailey*, 294 Ga. 758, 764 (755 SE2d 805) (2014). Thus, the statute establishes an objective standard

on this issue; the health care provider's subjective belief about what kind of care he was providing the patient or what kind of care the patient needed does not determine whether "bona fide emergency services" were provided. See *Howland v. Wadsworth*, 324 Ga. App. 175, 180 (749 SE2d 762) (2013) (concluding that an issue of fact existed as to whether OCGA § 51-1-29.5 applied because, although the patient was admitted to the emergency room as "non-urgent," "she was experiencing a medical condition which included symptoms of significant pain in her feet, coldness in her feet, and the inability to walk").

Indeed, other language in OCGA § 51-1-29.5 makes it clear that the statute may be applied to claims based on the provider's failure to properly recognize and treat a patient's condition as an emergency. Subsections (c) and (d) apply to "an action involving a health care liability claim," and the statute defines a "health care liability claim" as

> a cause of action against a health care provider or physician for treatment, *lack of treatment*, or other claimed departure from accepted standards of medical care, health care, or safety or professional or administrative services directly related to health care, which departure from standards proximately results in injury to or death of a claimant.

OCGA § 51-1-29.5 (a) (9) (emphasis added). See also OCGA § 51-1-29.5 (a) (7) (defining "health care" to mean "any act or treatment performed or furnished, *or that should have been performed or furnished*, by any health care provider for, to, or on behalf of a patient during the patient's medical care, treatment, or confinement" (emphasis added)); *Bonds v. Nesbitt*, 322 Ga. App. 852, 855 (747 SE2d 40) (2013).

Thus, the "bona fide emergency services" element precludes a health care provider from benefitting from the protections of the ER statute with regard to care that, viewed objectively, was not emergency service, such as giving routine flu shots at a clinic set up in an ER. But medical services commonly provided in an emergency department, like evaluating, classifying, and treating patients who come in asserting that they require emergency care, will generally be "bona fide emergency services," even if the result of those services is that the patient is diagnosed as not needing (or no longer needing) emergency treatment. See *Howland*, 324 Ga. App. at 181 ("[A]n emergency room physician or health care provider may still claim the protection of the gross negligence standard of OCGA § 51-1-29.5 when he or she mistakenly concludes that a patient has become 'stabilized' and 'capable of receiving medical treatment as a nonemergency patient.' ").

See also *Abdel-Samed*, 294 Ga. at 761, n. 5 (explaining that the definition of emergency medical care does not depend on "the manner in which [the patient's] condition is treated").

(c) Similarly, whether the condition of the patient meets the definition of "emergency medical care" is an objective, rather than subjective, test. See *Bonds*, 322 Ga. App. at 855 ("[T]he statute provides that the condition of the patient controls, not the opinion of the physician."). In order for the ER statute to apply, the patient must have had a

> medical or traumatic condition manifesting itself by acute symptoms of sufficient severity, including severe pain, such that the absence of immediate medical attention could reasonably be expected to result in placing the patient's health in serious jeopardy, serious impairment to bodily functions, or serious dysfunction of any bodily organ or part.

OCGA § 51-1-29.5 (a) (5). The patient's actual medical or traumatic condition is determinative — but only as that condition is revealed by the patient's symptoms. The factfinder must consider the evidence regarding the symptoms the patient presented and determine whether those symptoms were acute and sufficiently severe to show that the patient had a medical or traumatic condition that could reasonably be expected to seriously impair her health if not attended to immediately.

Although the health care provider's subjective opinion about the patient's condition is not controlling, it is relevant as evidence of the patient's condition. See *Howland*, 324 Ga. App. at 181 ("[The physician assistant's] determination that [the patient] was relatively stable at all times and that her condition had improved while she was in the emergency room is some evidence that [the patient] was in fact stabilized."); *Bonds*, 322 Ga. App. at 855 ("A doctor's determination that a patient has stabilized is some evidence that the patient has in fact stabilized."). To the extent known by the providers, the patient's medical history and the circumstances of her illness or injury may also be relevant in evaluating whether her symptoms indicate a medical or traumatic condition that could reasonably be expected to place a patient's health in serious danger if left untreated. See *Hosp. Auth. of Valdosta/Lowndes County v. Brinson*, 330 Ga. App. 212, 221 (767 SE2d 811) (2014) (listing the infant patient's reported history of being born premature and being hospitalized for pneumonia the month before as considerations in determining whether his fever,

diarrhea, poor oral intake, and uncharacteristic fussiness and sleepiness were sufficiently severe acute symptoms to require "emergency medical care").

On the other hand, symptoms that the patient developed or manifested *after* the emergency department care at issue are *not* relevant to this question, even if those later symptoms reveal that at the time the patient was in the ER, she was actually suffering from a life-threatening condition. "Emergency medical care" is limited to "services provided *after* the onset" of the condition manifesting itself by acute and severe symptoms. OCGA § 51-1-29.5 (a) (5) (emphasis added). Later developments have no bearing on the question of what symptoms were manifest at the time the patient was in the ER. See *Brinson*, 330 Ga. App. at 220 ("The question . . . is whether [the patient's] medical condition was manifested by acute symptoms of sufficient severity to trigger the gross negligence standard of OCGA § 51-1-29.5 (c)."). Thus, a patient who seeks treatment in an emergency room while suffering from a serious but hidden medical condition and displaying no "acute symptoms of sufficient severity" would not receive emergency medical care triggering OCGA § 51-1-29.5 (c).

3. We now apply these principles to the facts of this case, recognizing that we do so in the context of a summary judgment order.

> "On appeal from the grant of summary judgment, we construe the evidence most favorably towards the nonmoving party, who is given the benefit of all reasonable doubts and possible inferences. The party opposing summary judgment is not required to produce evidence demanding judgment for it, but is only required to present evidence that raises a genuine issue of material fact." Our review of the grant or denial of a motion for summary judgment is de novo.

*Johnson*, 294 Ga. at 75-76 (citations omitted).

It is undisputed that Keira's care was provided "in a hospital emergency department." The evidence also shows that Keira was given "bona fide emergency services," when that phrase is properly understood to focus on the services provided rather than, as the trial court erroneously understood it, to focus on the Providers' belief that Keira did not require emergency care. See Division 2 (b) above. Keira was examined and diagnosed by two health care providers tasked with triaging and treating patients in the emergency department. The fact that she was given a non-emergency ranking when classified by paramedic Evans and treated as a non-emergency patient when

examined by physician's assistant Heyer does not prevent these evaluations from being "bona fide emergency services" under the ER statute.

As to the evidence of Keira's manifested symptoms, both Evans and Heyer classified her as a non-emergency case. Heyer testified that she was interacting normally with her parents, and all of the evidence from the Providers indicates that the injury to Keira's head was not severe, including her medical chart and Heyer's testimony characterizing Keira's head contusion as "small." Based on this evidence, the trial court concluded that "there is no evidence that Keira had severe pain, or any other severe symptoms" bringing this case within the scope of OCGA § 51-1-29.5 when she was treated in the ER. If this were the only evidence of Keira's symptoms, then that conclusion might be correct. But the trial court failed to consider all of the evidence in the record and to view it in the light most favorable to the Providers as the parties opposing summary judgment.

The record includes evidence that the Providers knew that Keira was a six-month-old child who had been brought to the ER after falling from a bed onto her head. Those were relevant facts. As the Parents' medical expert explained in his affidavit, the risks of severe injuries from such a fall are greater for children under two years of age. But more importantly, and not mentioned in the trial court's order, rather than characterizing the bump on the back of Keira's head as "small," Keira's mother, Nguyen, described the injury in her deposition as a reddish-purple swelling the size of an "apple" or "another head." Evidence that an infant fell on her head and suffered a bruise that had swollen to the size of her head (or even the size of an apple) shortly before being brought to the ER is evidence that a jury could find to be "acute symptoms of sufficient severity . . . such that the absence of immediate medical attention could reasonably be expected to result in placing the [infant's] health in serious jeopardy," within the meaning of OCGA § 51-1-29.5 (c).[2]

Of course, a jury might also disbelieve Nguyen's description of Keira's head injury, which seems at the least exaggerated and is contradicted by testimony from two medical professionals that is supported by contemporaneous medical records. Nevertheless, that is a determination to be made by a jury, not a court applying the summary

---

[2] In finding the evidence sufficient to trigger OCGA § 51-1-29.5 (c), the Court of Appeals also indicated that the jury should consider Keira's later readmission to the hospital and ultimate severe injuries. See *Nguyen*, 330 Ga. App. at 160. As explained in Division 2 (c) above, however, it generally would be improper to consider developments occurring after the emergency room visit that is the basis of the Parents' claim.

judgment standard of review. As we recently reiterated in a case that involved the "gross negligence" element of OCGA § 51-1-29.5:

> Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.

*Johnson*, 294 Ga. at 77 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 255 (106 SCt 2505, 91 LE2d 202) (1986)). Or as Justice Blackwell made the point in the same case:

> When a court considers a motion for summary judgment [under OCGA § 9-11-56 (c)], it must view the pleadings and evidence in the light most favorable to the nonmoving party, it must accept the credibility of the evidence upon which the nonmoving party relies, it must afford that evidence as much weight as it reasonably can bear, and to the extent that the moving party points to conflicting evidence, it must discredit that evidence for purposes of the motion. Thus, if a defendant in a case like this one moves for summary judgment and points to the favorable testimony of a dozen winners of the Nobel Prize for Medicine (all of whom say that he did not deviate at all from the accepted standard of medical care), but the plaintiff responds with the admissible testimony of a barely qualified medical expert (who shows that the defendant substantially and grossly deviated from the accepted standard of medical care), the trial court must assume — as unlikely as it may be — that the jury will believe the plaintiff's expert and disbelieve the expert array offered by the defendant. For purposes of the motion for summary judgment, the trial court would consider the testimony of the plaintiff's expert, but not the conflicting testimony of the Nobel Prize winners.

*Johnson*, 294 Ga. at 84-85 (Blackwell, J., concurring). Nothing in the ER statute purports to modify the usual standard for summary judgment under OCGA § 9-11-56 (c), and indeed the General Assembly's authority to alter the summary judgment standard is limited by the right to trial by jury guaranteed by the Georgia Constitution. See *Johnson*, 294 Ga. at 85 (Blackwell, J., concurring).

In sum, the record shows a genuine issue of material fact as to whether the heightened proof standards set forth in OCGA § 51-1-29.5 (c) apply in this case, and the trial court therefore erred in granting summary judgment on this issue.[3] See *Brinson*, 330 Ga. App. at 221 (explaining that in a case where there is some evidence that the patient did not have acute and severe symptoms and some evidence that she did, the jury had to assess "whether [OCGA § 51-1-29.5] applies and whether the defendants met whatever standard of negligence the jury determines to be applicable"). Accordingly, we affirm the Court of Appeals's judgment reversing the trial court's grant of partial summary judgment to the Parents.[4]

*Judgment affirmed. All the Justices concur, except Hunstein, J., who concurs in judgment only as to Division 2.*

DECIDED NOVEMBER 2, 2015.

330 Ga. App. 156.

*Flynn Peeler Phillips, Paul G. Phillips; Brown & Scoccimaro, Ralph O. Scoccimaro*, for appellants.

*Huff, Powell & Bailey, Jeffrey D. Braintwain, Erica S. Jansen; Watson Spence, C. Richard Langley*, for appellees.

*Summerville Moore, S. Leighton Moore III; Harris Penn Lowry, Darren W. Penn; Green & Sapp, Henry D. Green, Jr., Daniel J. Moriarty*, amici curiae.

---

[3] We are not oblivious to the ironies produced by the evidence in this case and by the ER statute in general. Due to the summary judgment standard of review, the defendant Providers are avoiding a pre-trial ruling that OCGA § 51-1-29.5 does not apply in this case based primarily on testimony from one of the plaintiff Parents that the Providers' own witnesses squarely contradict. It is hard to imagine that the Providers will argue at trial that their witnesses should be discredited and the plaintiff believed about the size of the lump on Keira's head. And as will often be the situation in cases of this sort, to avoid the application of OCGA § 51-1-29.5 but still prevail at trial, the Parents will need to argue that Keira's symptoms were serious enough that the Providers were negligent in failing to recognize the need for more tests and treatment – but not severe enough to require "emergency medical care." Conversely, to invoke OCGA § 51-1-29.5 and still prevail at trial, the Providers will have to argue that Keira's symptoms were so severe that their treatment was "emergency medical care" – but not serious enough that a failure to treat them with anything more than a minimal exam was grossly negligent.

[4] In the Court of Appeals, the Providers argued that *they* are entitled to summary judgment that OCGA § 51-1-29.5 applies to this case, but they did not move for summary judgment in the trial court, so the Court of Appeals did not decide that issue. See *Nguyen*, 330 Ga. App. at 161. The Providers have not renewed this argument before this Court, and their counsel appeared to concede at oral argument here that they are not entitled to summary judgment on this point given the conflicting evidence.