

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-18-00040-CV

_____

TAMISHA NICOLE CAMPBELL, INDIVIDUALLY AND AS GUARDIAN AND
NEXT FRIEND OF TAMATHA NANETTE WILLIAMS, AN INCAPACITATED
PERSON, Appellant

V.

PAUL H. POMPA, M.D. AND MARCUS LESLY WEATHERALL, M.D.,
Appellees

On Appeal from the 348th District Court
Tarrant County, Texas
Trial Court No. 348-275904-14

Concurring and Dissenting Opinion by Justice Gabriel

**CONCURRING AND DISSENTING OPINION**

I agree with many holdings contained in the majority opinion and I applaud the careful and thoughtful analysis the majority undertakes in this tragic case. But I must dissent to a portion of the majority's opinion and judgment because I believe that the current interpretation of the circumstances under which the statutory willful-and-wanton standard of proof is applied to the provision of emergency medical care (EMC) has been impermissibly stretched to encompass even the provision of nonemergent medical care. To support its conclusion that the evidence buttressing the jury's finding that appellee Paul H. Pompa, M.D. provided such care to Tamatha Nanette Williams on December 11, 2012, was factually sufficient, the majority relies on an intermediate appellate court decision that created an all-encompassing interpretation of the statutory definition of EMC that risks de facto qualifying any and all medical care as EMC. I believe that the definition is not so broad and that the overwhelming weight of all the record evidence shows that Pompa was not providing EMC as statutorily defined.

## I. CONCUR

I first address the bulk of my agreements with the majority.[1] I agree that Campbell's failure to specially except or otherwise object to Pompa's pretrial failure to raise the protection of section 74.153, which imposes a willful-and-wanton standard

---

[1]There are other portions of the majority with which I agree that are more appropriately addressed in my dissent.

2

of proof, waives her right to "protest this discrepancy on appeal."[2]  I agree that the great weight and preponderance of the evidence reveals that Pompa provided bona fide emergency services after the sudden onset of a medical condition.[3]  I agree that even though appellee Marcus Lesly Weatherall, M.D. provided EMC to Williams, the jury's finding that he did not do so with willful or wanton negligence was not against the great weight and preponderance of the evidence.[4]  I agree that Campbell's right to a representative venire was not violated by Tarrant County's electronic jury system. Finally, I agree that the trial court did not abuse its discretion by admitting evidence

---

[2]I express no opinion on the majority's holding that section 74.153 is not an affirmative defense even though a related statute with a "common legislative origin" has been found to be an affirmative defense.  Based on Campbell's waiver, this question could and should be saved for a later day.

[3]I do dissent from the majority's adopted definition of bona fide emergency services, which I explain below in section II.A.1., but conclude that a more precise definition does not call the jury's finding on this issue into question in this case.

[4]But I disagree with the majority's statement that the only evidence indicating Dr. Domingo K. Tan was not at the hospital at the time he was contacted about Williams's need for emergency surgical intervention came from a nurse with an "inexact" memory of events.  Tan testified at trial by deposition that he would not have been contacted or discussed Williams with Weatherall by phone if Tan had physically been at the hospital.  He also stated that he assumed he told Weatherall he was "on [his] way" after talking to him on the phone, which was his routine practice. Even so, this is merely competing evidence that Weatherall breached the applicable standard of care as alleged by Campbell, which does not lead to a conclusion that the converse evidence, recited by the majority, was factually insufficient to support the jury's no-negligence finding as to Weatherall.  *See Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003).  This is especially true in light of the fact that Weatherall testified Tan gave no indication that it would take him 30 to 45 minutes to get to the hospital.

regarding Campbell's prior nonsuit of her claims against TotalCare Clinic, the site of Williams's December 10, 2012 medical visit.

## II. DISSENT

But I disagree with the majority's conclusion that the jury's finding that Pompa's provided care met the statutory definition of EMC was not against the great weight and preponderance of the evidence.[5] As the majority explains, if Pompa provided EMC, the applicable standard of proof rose to willful and wanton negligence. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.153. To be considered EMC with the attendant heightened standard of proof, (1) the challenged care must be "bona fide" emergency services, (2) the services were provided after the sudden onset of a medical or traumatic condition, and (3) the condition was manifested by acute symptoms of sufficient severity such that the absence of immediate medical attention "could reasonably be expected" to result in placing the patient's health in serious jeopardy, serious impairment of bodily functions, or serious dysfunction of any bodily

---

[5]I question whether the correct standard for the factual sufficiency of the evidence is correctly phrased as one that places the burden of proof for the jury question at issue on Campbell—against the great weight and preponderance of the evidence. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001); W. Wendell Hall et al., *Hall's Standards of Review in Texas*, 42 St. Mary's L.J. 3, 41–42 (2010). Whether Pompa's provided care met the statutory definition of EMC, giving him the benefit of section 74.153, should not have been Campbell's burden to prove. But my ultimate conclusion would be unchanged even if Campbell's factual-sufficiency issue were more appropriately briefed as if she did not have the burden of proof on the issue. For this reason, I will refer to the issue as the parties briefed it and as the majority addresses it.

organ or part.[6]  *Id.* § 74.001(a)(7).  These parts of the definition have been loosely described as the type-of-care element and the time-and-circumstances element.  *See Burleson v. Lawson*, 487 S.W.3d 312, 319 (Tex. App.—Eastland 2016, no pet.); *Turner v. Franklin*, 325 S.W.3d 771, 776–77, 779 (Tex. App.—Dallas 2010, pets. denied).

## A.  STATUTORY DEFINITION OF EMC

Campbell contends that the great weight and preponderance of the evidence shows that Pompa was not providing EMC on December 11, 2012, contrary to the jury's verdict.[7]  This appellate issue has two related inquiries, which Campbell argued in her motion for new trial and in her appellate brief: (1) the appropriate statutory interpretation of the EMC definition and (2) whether the great weight and preponderance of the evidence as compared to this statutory definition did or did not support the jury's finding that Pompa provided EMC to Williams.  *See Ho v. Johnson*, No. 09-15-00077-CR, 2016 WL 638046, at *10 (Tex. App.—Beaumont Feb. 18, 2016, pet. denied) (mem. op.) ("Whether Thompson's and Williams's care constituted [EMC] under the statute is a mixed question of law and fact.").  In other words, it must first be determined what constitutes EMC under the terms of its statutory definition before sufficiency can be assayed.  *See id.*; *Harper Park Two, LP v. City of*

---

[6]The jury charge tracked this statutory definition of EMC.  *See, e.g.*, Comm. on Pattern Jury Charges, State Bar of Tex., *Texas Pattern Jury Charges: Malpractice, Premises & Products* PJC 51.18 cmt. (2018).

[7]Pompa testified that on December 11, 2012, Williams was "under [his] care" and that he "absolutely" examined, assessed, treated, diagnosed, and discharged her.

*Austin*, 359 S.W.3d 247, 254–55 (Tex. App.—Austin 2011, pet. denied); *accord Alfaro-Jimenez v. State*, No. PD-1346-17, 2019 WL 2814864, at *4 (Tex. Crim. App. July 3, 2019) ("Of course, in some cases, sufficiency of the evidence also turns on the meaning of the statute under which the defendant has been prosecuted."). Thus, I begin with the legal determination of the statutory construction of the EMC definition, which is reviewed de novo. *See Tex. Health Presbyterian Hosp. of Denton v. D.A.*, 569 S.W.3d 126, 131 (Tex. 2018).

## 1. Type-of-Care Element

The majority adopts the Dallas Court of Appeals' definition of bona fide emergency services: "[A]ny actions or efforts undertaken in a good faith effort to diagnose or treat a mental or physical disease or disorder or a physical deformity or injury by any system or method, or the attempt to effect cures of those conditions." *Turner*, 325 S.W.3d at 778; *see also Burleson*, 487 S.W.3d at 319–20. The *Turner* court arrived at this expansive definition through two interpretive tools: (1) a partial dictionary definition of "bona fide" as "good faith" and (2) the statutory definition of "medical care" contained in section 74.001(a)(19)—"[A]ny act defined as practicing medicine under Section 151.002, Occupations Code,[8] performed or furnished, or

---

[8]The occupations code defines practicing medicine as "the diagnosis, treatment, or offer to treat a mental or physical disease or disorder or a physical deformity or injury by any system or method, or the attempt to effect cures of those conditions." Tex. Occ. Code Ann. § 151.002(a)(13). This definition was enacted in the context of licensing, regulating, and disciplining physicians. *See id.* § 151.003; *Aleman v. Tex. Med. Bd.*, 573 S.W.3d 796, 802 (Tex. 2019).

which should have been performed, by one licensed to practice medicine in this state for, to, or on behalf of a patient during the patient's care, treatment, or confinement." Tex. Civ. Prac. & Rem. Code Ann. § 74.001(a)(19); *Turner*, 325 S.W.3d at 778 & n.8. In other words, the *Turner* court's definition of bona fide emergency services, which the majority adopts today, is nothing more than good faith medical care, failing to fully and adequately address the clear modifiers to qualifying medical services—bona fide and emergency. *Turner*, 325 S.W.3d at 778; *cf. Crocker v. Babcock*, 448 S.W.3d 159, 164–67 (Tex. App.—Texarkana 2014, pet. denied) (refusing to follow *Turner*'s definition of bona fide emergency services and holding determination of whether those services were provided examines "context in which the emergency department care was provided"). The gravitational pull of this overly broad definition of bona fide emergency services in effect draws all medical care into its orbit. *See generally Fort Worth Transp. Auth. v. Rodriguez*, 547 S.W.3d 830, 838 (Tex. 2018) (recognizing statutory construction attempts "to give effect to every word, clause, and sentence . . . because every word or phrase is presumed to have been intentionally used with a meaning and a purpose.").

*Turner* recognized that in some circumstances, bona fide could mean actual or real as opposed to its literal Latin meaning—"in good faith"—but rejected this "secondary meaning" on nothing more than its ipse dixit that a statute cannot contain

both objective and subjective components.[9] *Turner*, 235 S.W.3d at 778. I find no authority to support this reasoning. *See, e.g.*, *Tex. Dep't of Human Servs. v. Okoli*, 440 S.W.3d 611, 614 (Tex. 2014) (recognizing statutory definition may contain objective and subjective components). I would therefore find *Turner*'s reasoning for discounting the alternate meaning of bona fide to be unpersuasive and dissent to the majority's adoption of this broad definition of bona fide emergency services. *See Crocker*, 448 S.W.3d at 165–67.

The Georgia Supreme Court has interpreted the term bona fide emergency services in context as being more than medical care provided in good faith but as being "genuine or actual" emergency services, which is determined by looking at the context in which the services were provided. *Abdel-Samed v. Dailey*, 755 S.E.2d 805, 810–11 (Ga. 2014) (construing Ga. Code Ann. section 51-1-29.5(a)(5), which is identical to section 74.001(a)(7)'s EMC definition); *see also Worsdale v. City of Killeen*, No. 18-0329, 2019 WL 2479177, at *9 (Tex. June 14, 2019) (holding in statutory construction, "text cannot be divorced from context"); *see also Mosley v. Tex. Health & Human Servs. Comm'n*, No. 17-0345, 2019 WL 1977062, at *7 (Tex. May 3, 2019) (relying on surrounding context of specifically challenged statute to determine its meaning). This distinction from the definition in *Turner* could make a difference in

---

[9]*Turner* seems to equate objective with prospective and subjective with retrospective. 325 S.W.3d at 778. Because prospective and retrospective have particular and different meanings in the context of statutory construction, I will use objective and subjective. *See* Tex. Gov't Code Ann. § 311.022.

future cases interpreting this portion of the EMC definition. But it does not here as I will discuss in applying the definition of EMC to the facts of this case.

## 2. Time-and-Circumstances Element

I take no issue with the majority's approach to the appropriate statutory construction of the time-and-circumstances element. I do however pause to note my agreement with the majority's recognition that although this element has historically been viewed objectively, *see Burleson*, 487 S.W.3d at 321; *Ho*, 2016 WL 638046, at *10; *Turner*, 325 S.W.3d at 777, 779, the healthcare provider's subjective belief of the severity of the presented symptoms at the time the care was provided cannot be "wholly irrelevant." But whether the jury's finding that Pompa met the time-and-circumstances element of the EMC definition was against the great weight and preponderance of the evidence is a separate inquiry from the legal question of its statutory meaning.

## B. EVIDENCE TESTED AGAINST EMC DEFINITION

*Turner*, the majority, and the Georgia Supreme Court agree that the provision of bona fide emergency services, no matter how defined, is determined objectively. *Nguyen v. Sw. Emergency Physicians, P.C.*, 779 S.E.2d 334, 338–39 (Ga. 2015); *Abdel-Samed*, 755 S.E.2d at 811; *Turner*, 325 S.W.3d at 778. Accordingly, "the health care provider's subjective belief about what kind of care he was providing the patient or what kind of care the patient needed does not determine whether 'bona fide emergency services' were provided." *Nguyen*, 779 S.E.2d at 338–39; *see Turner*,

9

325 S.W.3d at 778. This analysis should look at the context in which the services were provided to determine if the patient received actual emergency services. *Crocker*, 448 S.W.3d at 167. Viewed objectively, the services that were undisputedly provided to Williams—an EKG test, a chest X-ray, and repeated monitoring of her vital signs—were "medical services commonly provided in an emergency department, like evaluating, classifying, and treating patients who come in asserting that they require emergency care," *Nguyen*, 779 S.E.2d at 339; thus, they were bona fide or actual emergency services even though Pompa believed at the time that Williams "had time to wait" and even though Williams later was diagnosed with a condition not needing emergency treatment. I therefore agree with the majority that it was not against the great weight and preponderance of the evidence for the jury to have found that Williams was provided bona fide emergency services.[10] *Cf. id.* (noting routine flu shots at a clinic set up in an emergency department would not be bona fide emergency services).

I also agree that it was not against the great weight and preponderance of the evidence for the jury to find that these services were provided after the sudden onset of Williams's symptoms. But I cannot agree with the conclusion that the evidence was factually sufficient to show that Williams's symptoms were sufficiently severe

[10]I note that some facts would have supported a finding that Williams did not receive actual emergency services, but it was not against the great weight and preponderance of the evidence for the jury to find otherwise.

10

such that the failure to immediately provide medical attention could reasonably be expected to result in "dire consequences" to Williams. *Turner*, 325 S.W.3d at 779.

The majority ably recounts the evidence suggesting that the surrounding circumstances met the EMC definition: the intake nurse classified Williams as "urgent," Williams's blood pressure was "highly elevated," Williams reported her throat pain to be a ten on a ten-point scale, the triage nurse ordered an EKG after Williams reported chest tightness and pain, and the prescribed steroids were "strong." But Pompa repeatedly testified that Williams's condition was not severe enough to warrant immediate medical attention—Williams had "[n]othing that suggested an emergency." Pompa explained that Williams's classification as "urgent" or as a "Level 3" meant that she did not have to be seen within minutes but could wait to see a physician "roughly" for an hour. Indeed, acute or "more severe" patients are generally placed in exam rooms one or two; the triage nurse, Kimberly Harbold, placed Williams in room eight. During Harbold's triage assessment and the subsequent exam by the primary nurse, Williams had an elevated blood pressure and heart rate that dropped as the visit progressed with a consistently high oxygen-saturation percentage. The EKG exam revealed a "nonspecific T wave abnormality," which is "not associated with acute coronary issues" and, thus, was not "concerning." Indeed, none of Williams's symptoms caused her healthcare providers concern that she had a severe medical condition that if left untreated, could lead to dire consequences.

11

In short, none of the healthcare providers that treated Williams on December 11, 2012—Pompa, Harbold, and Bennett—testified that Williams was or could have been considered in need of immediate medical attention. Even in light of the facts relied on by the majority, the great weight and preponderance of the evidence shows that Williams's condition on December 11 could not reasonably be expected to result in dire consequences if she did not receive immediate medical attention.

The effect of the majority's contrary conclusion is that any visit to a hospital's emergency department is transformed into the provision of EMC simply because the services were provided by emergency healthcare providers in a hospital's emergency department. Here, Williams's symptoms were "[n]othing that suggested an emergency." The majority suggests that merely because respiratory infections can at times prove fatal, if such an infection is treated with actual emergency services in an emergency department on a nonemergent basis, as occurred here, the definition of EMC is met. Any presented medical condition could conceivably be the harbinger of a more serious condition, but we are to look objectively at the surrounding circumstances at the time of treatment, not with the benefit of hindsight, to see if those circumstances met the definition of EMC. Here, they did not. And I cannot agree with the majority that Williams's resulting persistent vegetative state is evidence supporting the prior provision of EMC. This stretches the definition of EMC too far.

12

# III. CONCLUSION

The difficulty in applying a factual-sufficiency review to a jury's found facts is no surprise:

> The decision [in a factual-sufficiency review] necessarily turns on a process that is incapable of formulation, because its purpose is to allow the judge to correct a miscarriage of justice even when no formula or specific standard compels the correction. . . . Courts are told that the jury's findings should not be disturbed unless the verdict is "manifestly unjust," or such as to "shock the conscience" or "clearly demonstrate bias." Yet, these are findings on questions which have gone to the jury only because reasonable minds could differ on the answers. Furthermore, courts of appeals are told to "weigh all of the evidence" but not "reweigh it."

William Powers Jr. & Jack Ratliff, *Another Look at "No Evidence" and "Insufficient Evidence,"* 69 Tex. L. Rev. 515, 525–26 (1991) (citations omitted); *see also In re King's Estate*, 244 S.W.2d 660, 662 (Tex. 1951) (per curiam) ("It is, indeed, not simple to describe the intellectual process to be followed by the Court of Civil Appeals in passing on the fact question–to specify just how a verdict may be supported by evidence of probative force and at the same time be on all the evidence so clearly unjust as to require a new trial."). A helpful description of the parameters of a factual-sufficiency review recognizes that a "decent respect for the collective wisdom of the jury," generally leading to deference in most cases, cannot override our duty to avoid miscarriages of justice; therefore, "[p]robably all that the judge can do is to balance these conflicting principles in the light of the facts of the particular case." 11 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2806 (3d ed.

1998).  Here, the facts show that on December 11, 2012, no one treated Williams as if she had a severe medical condition that required immediate medical attention to avoid dire consequences.  There is some probative evidence supporting a finding that Pompa provided EMC, mainly based on the evidence that Williams was provided bona fide emergency services; but the great weight and preponderance of all the evidence shows that those services did not meet the definition of EMC under the presented circumstances.  As such, the heightened standard of proof for Campbell's claims against Pompa should not apply.  I would reverse the jury's verdict as to Pompa and remand for a new trial.

/s/ Lee Gabriel

Lee Gabriel
Justice

Delivered:  August 15, 2019

14