**Don Wayne BURLESON, Individually and in His Capacity as Independent Administrator of the Estate of Patricia Ann Burleson, Deceased, and Heather Dickson, Appellants**

v.

**Robert LAWSON, M.D., Appellee.**

No. 11–14–00004–CV

Court of Appeals of Texas, Eastland.

Opinion filed February 18, 2016

Daniel Sullivan, Stephen C. Maxwell, Fort Worth, for Appellants.

David M. Walsh IV, Kimberly K. Bocell, William H. Chamblee, Dallas, for Appellee.

Panel consists of: Wright, C.J., Willson, J., and Bailey, J.

## OPINION

JOHN M. BAILEY, JUSTICE

This appeal concerns the applicable standard of proof in a case involving medical care provided in a hospital emergency department. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.001(7) (West Supp. 2015), § 74.153 (West 2011). Appellants are the survivors of Patricia Ann Burleson, deceased. They filed a medical malpractice suit against Dr. Robert Lawson. Appellants appeal the trial court's orders granting Dr. Lawson's traditional and no-evidence motion for summary judgment and denying their motion for partial summary judgment on traditional and no-evidence grounds. In two issues on appeal, Appellants assert that the trial court erred when it granted Dr. Lawson's motion for summary judgment based upon the willful and wanton standard of proof set out in Section 74.153. We affirm.

### Background Facts

On December 10, 2010, Patricia Burleson called her husband, Don Burleson, and asked him to come home quickly. She was complaining of severe chest pain radiating down her left arm. He took her to the emergency room of Hendrick Medical Center. Hospital personnel assigned her to an exam room in the emergency department, and approximately forty minutes later, Dr. Lawson saw her. Prior to Dr. Lawson's arrival, the nurses ordered an EKG, lab work, and a chest X-ray for Mrs. Burleson. Dr. Lawson interviewed Mrs. Burleson and reviewed the notes taken by the nurses upon Mrs. Burleson's arrival. Mrs. Burleson complained that the chest pain had lasted three hours, "that it was still present, that it was ... sharp and on the left side of her chest, [and] that it was nonradiating." It was noted that she was overweight and had a family history of coronary artery disease. Dr. Lawson wrote down on her chart: "There was no nausea, vomiting, sweating, shortness of breath. It did hurt to breathe. No palpitations, cough, weakness or dizziness." Dr. Lawson did not make any diagnosis at the end of this initial interview.

Dr. Lawson ordered another round of tests, including another EKG and blood

work, to be conducted ninety minutes after the initial tests. The second blood test came back, and Dr. Lawson observed:

> The creatine kinase that—that one is one of the cardiac enzymes that we look at. Those were identical in both [tests]. The troponin—in our lab values normals go up to 0.6 micrograms per liters as you can see. Both of those were well within the normal range, so as far as being clinically significant, they were not felt to be clinically significant. They were both well within the normal range.

Dr. Lawson read both EKGs and determined that they were "not abnormal." Based on his assessment of Mrs. Burleson and the test results, Dr. Lawson determined that Mrs. Burleson suffered from atypical chest pain and was "stable." Dr. Lawson discharged Mrs. Burleson with a prescription for chest pain. However, Mrs. Burleson died approximately fourteen hours later of "probable acute myocardial infarction."

Appellants assert that Dr. Lawson's treatment fell below the applicable standard of care. Specifically, they allege that he failed to realize "that [Mrs. Burleson] was in the process of having an acute myocardial infarction." Appellants contend that he should have kept her in the emergency department longer for additional testing and observation, that he should have had a cardiac catheterization immediately performed on her, and that he should have requested a cardiovascular consultation. They concluded their allegations by asserting that Dr. Lawson was negligent "[i]n discharging Patricia Ann Burleson from the Hendrick Medical Center Emergency Department in the face of symptoms clearly indicative of the fact that [she] was in the process of a myocardial infarction."

Appellants filed a motion for partial traditional and no-evidence summary judg-ment in which they argued that the willful and wanton standard of proof set out in Section 74.153 does not apply in this case. Dr. Lawson filed a traditional and no-evidence motion for summary judgment in which he asserted that the statute did apply and that Appellants had not produced any evidence that Dr. Lawson acted with willful and wanton negligence. Appellants filed a response to Dr. Lawson's motion and reargued the same points from their summary judgment motion. The trial court held a hearing on the competing motions for summary judgment. The day after the hearing, Appellants filed a supplemental response to Dr. Lawson's motion for summary judgment, in which they produced new evidence to rebut his no-evidence motion. The trial court then granted Dr. Lawson's motion for summary judgment on both traditional and no-evidence grounds and denied Appellants' motion for summary judgment.

### Analysis

Appellants assert two issues on appeal. In their first issue, they contend that the trial court erred in concluding that the willful and wanton standard of proof set out in Section 74.153 applies to this case. They premise this issue on their contention that the statute does not apply "[b]e-cause Dr. Lawson perceived Patricia Burleson as stable at the time of the acts complained of in the trial court." In their second issue, Appellants contend that, even if the willful and wanton standard of proof applies, the evidence was sufficient to overcome Dr. Lawson's motion for summary judgment under this standard.

We review a summary judgment de novo. *Mid–Century Ins. Co. of Tex. v. Ademaj,* 243 S.W.3d 618, 621 (Tex.2007). When cross-motions for summary judgment are filed and the trial court grants one and denies the other, we review all

issues presented and enter the judgment that the trial court should have entered. *Bradley v. State ex rel. White*, 990 S.W.2d 245, 247 (Tex.1999); *Moon Royalty, LLC v. Boldrick Partners*, 244 S.W.3d 391, 394 (Tex.App.–Eastland 2007, no pet.). Dr. Lawson moved for summary judgment on both no-evidence and traditional grounds, and the trial court's order granting summary judgment does not specify the basis for its ruling. *See* TEX.R. CIV. P. 166a(c), 166a(i). Under these circumstances, we must affirm the summary judgment if any of the theories presented to the trial court are meritorious. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 216 (Tex.2003).

■ When a party moves for summary judgment on both no-evidence and traditional grounds, the appellate court should ordinarily address the no-evidence grounds first. *Merriman v. XTO Energy, Inc.*, 407 S.W.3d 244, 248 (Tex.2013). Both parties' no-evidence summary judgment grounds concern the evidence regarding Dr. Lawson's conduct under the willful and wanton standard. Dr. Lawson asserted that Appellants had no evidence that his alleged acts and omissions rose to the level of willful and wanton conduct, while Appellants asserted that Dr. Lawson had no evidence that he provided emergency medical services in order to invoke the willful and wanton standard of proof. Additionally, both parties addressed the applicability of the emergency care statute in their motions for traditional summary judgment. Accordingly, we must address the legal question of whether the willful and wanton standard applies under Section 74.153 in order to resolve Appellants' first issue.

Section 74.153 governs health care liability claims for injuries or death arising from the provision of "emergency medical care in a hospital emergency department or obstetrical unit or in a surgical suite immediately following the evaluation or treatment of a patient in a hospital emergency department." The statute provides that the claimant:

[M]ay prove that the treatment or lack of treatment by the physician or health care provider departed from accepted standards of medical care or health care only if the claimant shows by a preponderance of the evidence that the physician or health care provider, with wilfull and wanton negligence, deviated from the degree of care and skill that is reasonably expected of an ordinarily prudent physician or health care provider in the same or similar circumstances.

CIV. PRAC. & REM. § 74.153. "Emergency medical care" is defined as:

[B]ona fide emergency services provided after the sudden onset of a medical or traumatic condition manifesting itself by acute symptoms of sufficient severity, including severe pain, such that the absence of immediate medical attention could reasonably be expected to result in placing the patient's health in serious jeopardy, serious impairment to bodily functions, or serious dysfunction of any bodily organ or part.

*Id.* § 74.001(7). The definition continues: "The term does not include medical care or treatment that occurs after the patient is stabilized and is capable of receiving medical treatment as a nonemergency patient or that is unrelated to the original medical emergency." *Id.*

■ In their motion for summary judgment, Appellants argued that Section 74.153 does not apply to their claims because Dr. Lawson did not provide "emergency medical care." As noted previously, they base this assertion on the contention that Dr. Lawson cannot invoke the heightened standard set out in Section 74.153 because he perceived Mrs. Burleson to be stable.

Appellants rely on *Guzman v. Memorial Hermann Hospital System* in support of their arguments. *Guzman v. Mem'l Hermann Hosp. Sys.*, No. H–07–3973, 2009 WL 780889, at *7–8 (S.D.Tex. March 23, 2009). In *Guzman*, a young boy who was feeling ill was taken to the emergency room. *Id.* at *1. The emergency room doctor obtained the child's medical history and did a physical examination. *Id.* The child had been coughing and vomiting and was complaining of nausea. *Id.* The doctor diagnosed the child as "clinically stable" and ordered several laboratory tests. *Id.* After reviewing some of the results of the blood work, the doctor determined that the child had viral syndrome and believed the child to be "stable for discharge." *Id.* The child actually had a bacterial infection, and no antibiotics were prescribed. *Id.* at *2. The child was subsequently diagnosed with pneumonia and "probable sepsis." *Id.*

The federal district court in *Guzman* concluded that the willful and wanton negligence standard did not apply. *Id.* at *7. The court specifically noted that the doctor admitted in his answer that the child "appeared to be stable from the first time he encountered [the child] in the emergency room until his discharge." *Id.* at *4 (alteration in original). The doctor was not "in a rush to treat an emergency or life-threatening condition." *Id.* "Nothing in the history, examination, and the [blood work] (absent the band count) showed that the absence of immediate additional medical treatment would put the patient's health in 'serious jeopardy, serious impairment to bodily functions, or serious dysfunction of any bodily organ or part.'" *Id.* at *7. The court ultimately concluded that the symptoms presented were typical of a patient with a routine viral syndrome or routine bacterial infection and that there were no facts to lead the doctor to believe that the child was suffering from an emergency medical condition. *Id.*

At the time *Guzman* was decided, no Texas state court had interpreted Section 74.153. Therefore, the court in *Guzman* relied on two federal statutes to guide their analysis. *Id.* at *6. However, the trial court specifically noted that neither party had cited, "and this court has not found, a case addressing whether the willful and wanton negligence standard of § 74.153 applies when the doctor perceived the patient as stable but the patient allegedly suffered from an emergency medical condition that the doctor did not detect." *Id.* at *6.

The Dallas Court of Appeals subsequently addressed this fact situation in *Turner v. Franklin*, 325 S.W.3d 771 (Tex. App.–Dallas 2010, pet. denied). The court in *Turner* applied the willful and wanton negligence standard set out in Section 74.153 after an emergency room doctor ultimately diagnosed a patient as stable when the patient actually suffered from a medical emergency. 325 S.W.3d at 779–80. Dr. Lawson relies on *Turner* in support of his position.

In *Turner*, the parents of a fourteen-year-old boy took him to a hospital emergency room with a complaint of pain in his lower left abdominal region and swelling in his left testicle. *Id.* at 774. The emergency room physician ordered a scrotal ultrasound in an effort to rule out a testicular torsion, a condition that is considered serious because the testicle will die if it is left untreated. *Id.* A radiologist reviewed the ultrasound images and said that there was no evidence of a testicular torsion. *Id.* at 774–75. The emergency room physician diagnosed the boy as suffering from epididymitis and discharged him approximately four hours later with prescriptions for pain medication and antibiotics. *Id.* at 775. Several days later, a urologist diagnosed a testicular torsion resulting in the loss of

the nonviable testicle. *Id.* The parents in *Turner* alleged that the emergency room doctor did not render emergency medical care because "[the emergency room doctor] diagnosed a non-emergency condition and treated [the boy's] condition in a non-emergent manner." *Id.* at 776. Thus, the contention by the parents in *Turner* is quite similar to Appellants' contention that Dr. Lawson is not entitled to the heightened willful and wanton standard of proof because he diagnosed Mrs. Burleson to be stable.

■ The Dallas Court of Appeals conducted an extensive review of Section 74.153 and the definition of "emergency medical care" set out in Section 74.001(7). *Id.* at 776–78. The court concluded that "emergency medical care" encompasses two elements: "(1) the type of care provided (i.e., 'bona fide emergency services'), and (2) the circumstances under which those services are provided." *Id.* at 777. The court first analyzed the second element "[b]ecause the legislature provided more detail" about it. *Id.* As noted by the court:

> Section 74.001(7) requires that the "bona fide emergency services" must be provided after the sudden onset of a medical or traumatic condition manifested with acute symptoms so severe that "the absence of immediate medical attention *could reasonably be expected* " to result in serious jeopardy to the patient's health, serious impairment to bodily functions, or serious dysfunction of any bodily organ or part.

*Id.*

■ The court determined that "it is the severity of the patient's condition, its rapid or unforeseen origination, and the urgent need for immediate medical attention—including diagnosis, treatment, or both—in order to minimize the risk of serious and negative consequences to the

patient's health that comprise the second element" of "emergency medical care." *Id.* The court further determined that the use of the phrase "could reasonably be expected" requires that the circumstances that meet the second element "must be viewed prospectively and objectively, not retrospectively or subjectively." *Id.* Relying on the legislative history of the statute, the court determined that viewing the statute retrospectively or subjectively "to only those situations where it is determined—after the fact—that a real emergency existed would frustrate the statute's purpose of providing—on a prospective basis—additional incentives to physicians and health care providers to treat patients in uncertain situations where a delay in treatment 'could reasonably be expected' to result in serious, negative consequences." *Id.* at 777 n. 6.

■ As for the first element concerning "bona fide emergency services," the court determined that it means "any actions or efforts undertaken in a good faith effort to diagnose or treat a mental or physical disease or disorder or a physical deformity or injury by any system or method, or the attempt to effect cures of those conditions. And if such services are provided during the time period and under the circumstances specified in section 74.001(7)." *Id.* at 778. The court reached this determination by analyzing other statutory definitions of "medical care" and the meanings of the Latin phrase "bona fide." *Id.*

Applying these standards to the facts in *Turner*, the court rejected the parents' contention that Section 74.153 only applies when a physician diagnoses a condition as an emergency and treats it as such. *Id.* at 778–79. One of the reasons cited by the court for rejecting this contention is that it would place an incentive on emergency room physicians to assume the direst of

circumstances, and treat the situation as such, in order to be assured of the protections afforded by the statute. *Id.* at 779. The court also cited the prospective nature of the statute's protections and the fact that the statute includes both the diagnosis and treatment of a condition that presents as a serious medical condition. *Id.* The court concluded that the emergency room doctor in *Turner* was entitled to rely upon the willful and wanton standard of proof because the child presented to the emergency room with the possible diagnosis of a testicular torsion, a condition that could have resulted in a loss of his testicle if not promptly treated. *Id.* As stated by the court, the emergency room doctor's actions "were in response to the sudden onset of acute and severe symptoms where the lack of immediate medical attention 'could reasonably be expected' to result in serious consequences to [the boy's] health and physical condition." *Id.*

The Texarkana Court of Appeals subsequently examined the applicability of Sections 74.001(7) and 74.153 to medical care given in a hospital emergency department in *Crocker v. Babcock*, 448 S.W.3d 159 (Tex.App.–Texarkana 2014, pet. denied). *Crocker* involved a patient presenting to the emergency room as a possible stroke patient. 448 S.W.3d at 160. She was airlifted to the hospital based upon the thought that she had suffered an acute stroke. *Id.* By the time she arrived at the hospital, her stroke symptoms had improved. *Id.* The emergency room doctor in charge of her care did not activate the hospital's stroke code protocol upon her arrival. *Id.* at 161. A CT scan ordered by the emergency room doctor ruled out the possibility of a hemorrhagic stroke, but not an ischemic stroke. *Id.* The emergency room doctor also consulted with a neurologist about the possibility of administering tissue plasminogen activator (tPA). *Id.* The emergency room doctor elected not to administer tPA based upon the patient's waning symptoms and apparent rapid improvement. *Id.* Approximately three hours after her arrival at the emergency room, the emergency room physician changed the patient's diagnosis to an "acute, non-hemorrhagic cardiovascular accident" and admitted her to the hospital. *Id.* It was subsequently determined that the patient had in fact suffered a stroke. *Id.* at 161–62.

The court in *Crocker* began its analysis by citing the legislative history behind the changes made to the "good Samaritan laws" to address the liability exposure of doctors who render emergency care. *Id.* at 163. "The changes attempt to address concerns about access to emergency care and how the threat of lawsuits had discouraged some physicians and other providers from providing emergency care services." *Id.* (quoting Michael S. Hull et al., *House Bill 4 and Proposition 12: An Analysis with Legislative History, Part Three*, 36 Tex. Tech L.Rev. 169, 264 (2005)) (internal quotation marks omitted). The court then turned its attention to the decision in *Turner*. After thoroughly discussing the reasoning used in *Turner*, the court in *Crocker* disagreed with *Turner*'s analysis and declined to apply *Turner*'s definition of "emergency services." *Id.* at 166. Instead, the court in *Crocker* resolved the question before it by examining "the context in which the emergency department care was provided to determine whether [the patient] received actual emergency services." *Id.* at 167.

The Texarkana Court of Appeals noted that there was no dispute that the patient presented to the emergency department for emergency medical evaluation and treatment due to the sudden onset of a possible stroke. *Id.* The court concluded that this was the type of medical condition Section 74.153 was designed to address.

*Id.* The court further noted that the nursing staff in the emergency department undertook various measures that were in immediate response to the sudden onset of the patient's condition. *Id.* The court concluded in *Crocker* that the willful and wanton standard of proof set out in Section 74.153 applied because the patient "presented the medical staff with an emergency condition and ... she was provided emergency services." *Id.* at 168.

We note at the outset the similarity of the duration of Mrs. Burleson's stay in the emergency room with the patients in *Turner* and *Crocker* of approximately three to four hours. Additionally, there is a similarity in the availability of medical histories and the administration of diagnostic testing in all three cases. These factors did not preclude a determination in *Turner* and *Crocker* that Section 74.153 applied to the cases. The decisions in *Turner* and *Crocker* differ in their analyses, but they reach the same result by holding that Section 74.153 governs the standard of proof for assessing the emergency room doctor's conduct under the facts of each case. We conclude that, under the analyses employed in either *Turner* or *Crocker*, Section 74.153 requires that Dr. Lawson's performance be assessed under the willful and wanton standard.

The Dallas Court of Appeals in *Turner* expressly rejected the contention advanced by Appellants that Dr. Lawson cannot invoke Section 74.153 if he did not ultimately diagnose an emergency condition and treat it as such. *Turner*, 325 S.W.3d at 778–79. We agree with the *Turner* analysis that the emergency room doctor's performance should be viewed prospectively and objectively rather than retrospectively or subjectively. *Id.* at 777. Under *Turner*, the very act of diagnosing Mrs. Burleson as "stable," under the circumstance and during the time period outlined in Section 74.001(7), is itself included within the meaning of "emergency medical care." *See id.* at 778 (concluding that the term medical care "encompass[es] diagnosis as well as treatment"). And that is true regardless of whether Dr. Lawson reached a diagnostic conclusion that Mrs. Burleson was suffering from a true emergency condition or determined that she was stable. *See id.* at 779. Unlike the situation in *Guzman*, Dr. Lawson did not believe that Mrs. Burleson was stable when she presented to the emergency room. He did not diagnose Mrs. Burleson as stable until the end of the examination and right before he discharged her.

Furthermore, Appellants themselves assert that Mrs. Burleson was a patient with a serious condition requiring emergency treatment and that she was not stable despite Dr. Lawson's diagnosis and treatment. As such, her condition was very similar to the stroke patient in *Crocker*. She went to the emergency department after experiencing "severe" and "sudden" pain. One of the possible diagnoses of her condition—a heart attack—could, if correct, result in the death of Mrs. Burleson. As noted above, the emergency room nurses ordered an EKG, lab work, and a chest Xray for Mrs. Burleson prior to Dr. Lawson's initial examination. Appellants do not dispute that Dr. Lawson's actions of conducting two EKGs and two sets of blood work constituted a good faith course of action under the circumstances.

We conclude that Dr. Lawson's actions were in response to the sudden onset of acute and severe symptoms where the lack of immediate medical attention "could reasonably be expected" to result in serious consequences to Mrs. Burleson's health and that his actions constituted "emergency services" within the meaning of Section 74.001(7) under either *Turner* or *Crocker*. *See* Civ. Prac. & Rem. § 74.001(7); *Crocker*,

448 S.W.3d at 168; *Turner*, 325 S.W.3d at 779. Thus, Appellants' medical malpractice claims arise out of the provision of emergency medical care within the meaning of Section 74.001(7), and Section 74.153 applies to their claims. Accordingly, the willful and wanton standard of proof applies to Appellants' claim against Dr. Lawson. We overrule Appellants' first issue.

Appellants' second issue addresses their contention that, even if the willful and wanton standard of proof applies, the evidence was sufficient to overcome Dr. Lawson's motion for summary judgment under this standard. Appellants argue that they presented more than a scintilla of evidence that Dr. Lawson was willfully or wantonly negligent in his treatment of Mrs. Burleson. As noted previously, Dr. Lawson filed a no-evidence summary judgment motion in which he asserted that Appellants had no evidence, or could not raise a fact issue about whether, he acted with willful and wanton negligence in his treatment of Mrs. Burleson. When we review a no-evidence motion for summary judgment, we determine whether the nonmovant presented sufficient evidence to raise a genuine issue of material fact on the challenged element. *See* Tex.R. Civ. P. 166a(i). We review the summary judgment evidence in the light most favorable to the nonmoving party, crediting evidence favorable to that party if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not. *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 581 (Tex.2006).

To resolve whether Appellants presented evidence of Dr. Lawson's willful and wanton negligence, we must assess the meaning of "wilful and wanton negligence" as used in the statute. Civ. Prac. & Rem. § 74.153. Based upon its reading of the applicable legislative history, the Dallas Court of Appeals determined that "willful and wanton negligence" is the equivalent of "gross negligence." *Turner*, 325 S.W.3d at 780–81. The parties in this appeal agree that gross negligence is the applicable standard.

Gross negligence is comprised of two elements—one objective and one subjective. *Id.* at 781 (citing *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 22–23 (Tex. 1994)). For the objective element, "the act or omission must depart from the ordinary standard of care to such an extent that it creates an extreme degree of risk of harming others." *Id.* (citing *Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue*, 271 S.W.3d 238, 238 (Tex.2008)). To meet this element, Dr. Lawson's conduct must involve the "likelihood of serious injury" to Mrs. Burleson. *Moriel*, 879 S.W.2d at 22. For the subjective element, Dr. Lawson must have "actual, subjective awareness of the risk involved and choose to proceed in conscious indifference to the rights, safety, or welfare of others." *Hogue*, 271 S.W.3d at 248. Appellants had the burden to produce more than a scintilla of evidence that Dr. Lawson met both the objective and subjective elements for gross negligence to defeat his summary judgment.

The summary judgment evidence attached to Appellants' initial response to Dr. Lawson's motion for summary judgment consisted of transcripts of the deposition of Mrs. Burleson's husband and Dr. Lawson. Appellants subsequently filed a supplement to their response that consisted of a five-page response with a transcript of the 150-page deposition of Appellants' expert, Dr. Paul Davidson, attached as an exhibit. On appeal, Appellants rely upon their supplemental response to defeat Dr. Lawson's no-evidence motion for summary judgment.

In their supplemental response, Appellants directed the trial court to two responses given by Dr. Davidson in his deposition. In the first instance, Dr. Lawson's

counsel asked Dr. Davidson the following question: "Okay. Do you think that Dr. Lawson, in his care and treatment of Ms. Burleson, acted with disregard to her welfare or well-being, an intentional or knowing disregard for her welfare and well-being?" To which Dr. Davidson replied, "Yes."[1] The second instance involved Appellants' counsel giving Dr. Davidson a lengthy definition of gross negligence. After reading the definition, Appellants' counsel asked Dr. Davidson: "Now, having read that very lengthy definition, my question to you is, do you have an opinion based on the definition I just read to you, was Dr. Lawson grossly negligent in his care and treatment of Patricia Burleson on December 10, 2010?" To which Dr. Davidson replied, "Yes." Dr. Davidson then replied, "My opinion is that he did commit willful and wanton negligence and gross negligence to Patricia Burleson."

In response to a no-evidence ground for summary judgment, the nonmovant must specifically point out the evidence that raises a genuine issue of material fact as to each challenged element. *San Saba Energy, L.P. v. Crawford,* 171 S.W.3d 323, 330 (Tex.App.–Houston [14th Dist.] 2005, no pet.). The nonmovant cannot meet its summary judgment burden to raise a fact issue by merely incorporating voluminous pages of evidence and generally claiming that the evidence raises a fact issue. *Id.* at 330–32. Otherwise, the trial court would have the onerous task of searching the summary judgment evidence to determine whether a genuine issue of material fact has been raised as to each challenged element. Such a procedure would place an unreasonable burden on the trial court. *Id.* at 331. Because Appellants only pointed out two responses from Dr. Davidson's deposition in the text of its supplemental response, we restrict our review to those two responses. We conclude that these two responses by Dr. Davidson did not raise a fact issue defeating Dr. Lawson's no-evidence motion for summary judgment under the willful and wanton standard of proof.

"A conclusory statement of an expert witness is insufficient to create a question of fact to defeat summary judgment." *Elizondo v. Krist,* 415 S.W.3d 259, 264 (Tex.2013) (quoting *McIntyre v. Ramirez,* 109 S.W.3d 741, 749–50 (Tex.2003)) (internal quotation marks omitted). The two passages cited by Appellants are simply opinions by Dr. Davidson that Dr. Lawson was grossly negligent without any explanation of the basis for his opinions. They are too conclusory to defeat Dr. Lawson's no-evidence motion for summary judgment. *See IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason,* 143 S.W.3d 794, 803 (Tex.2004).

In their initial response to the no-evidence motion for summary judgment, Appellants argued that the emergency medical care statute did not apply and summary judgment was improper on that ground. Appellants also incorporated their entire argument from their section for traditional motion for summary judgment. The only evidence referenced in this section was Dr. Lawson's deposition testimony about whether he perceived Mrs. Burleson as stable at the time he discharged her. Dr. Lawson's deposition testimony was in relevant part as follows:

Q. Did you believe that Mrs. Burleson had been stabilized when you made the decision to discharge her?

A. Yes. Yes, I thought she was stable when she was discharged.

---

1. Dr. Lawson's counsel followed up Dr. Davidson's affirmative response by asking him, "You do?" Dr. Davidson again replied, "Yes."

. . . .

Q. Sure. But at the time that she was dismissed, you wouldn't have dismissed her if you felt like she was still an emergency patient who needed emergency treatment. Correct?

A. That is correct.

Q. Obviously you didn't need—you didn't believe that she needed additional treatment, emergency or otherwise, at the time you discharged her other than following up with her family physician the following week. Correct?

A. That is correct.

 "Evidence of 'some care' will not disprove gross negligence as a matter of law." *Turner*, 325 S.W.3d at 784 (citing *Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917, 923–24 (Tex.1998)). Instead, courts must look for evidence of the defendant's subjective mental state. *Id.* Gross negligence requires proof that the defendant was subjectively aware of the risk involved and decided to proceed in conscious indifference of the rights, welfare, and safety of others. *Id.* (citing *Hogue*, 271 S.W.3d at 248).

While Appellants' evidence may well have raised a fact issue as to Dr. Lawson's negligence, it does not raise a fact issue about whether Dr. Lawson's alleged error in judgment was more than mere negligence. *Id.* at 785 (citing *Wheeler v. Yettie Kersting Mem'l Hosp.*, 866 S.W.2d 32, 50–51 (Tex.App.–Houston [1st Dist.] 1993, no writ)). Specifically, the quoted testimony did not address whether Dr. Lawson was subjectively aware of an extreme risk or acted with conscious indifference to the rights, safety, or welfare of others. And Appellants do not cite to any other direct or circumstantial evidence in the record raising a genuine issue of fact on the subjective element of willful and wanton negligence.

Because Appellants' evidence does not raise a genuine issue of material fact concerning the element of willful and wanton negligence, the no-evidence summary judgment was proper. The trial court did not err when it granted Dr. Lawson's no-evidence motion for summary judgment. We overrule Appellants' second issue.

*This Court's Ruling*

We affirm the orders of the trial court.